67 So.2d 732

**CITY OF SHREVEPORT v. ABE MEYER CORP.**

No. 40533.

July 3, 1953.

Rehearing Denied Oct. 6, 1953.

Hargrove, Guyton, Van Hook & Hargrove and Thomas E. Stagg, Jr., Shreveport, for defendant-appellant.

J. N. Marcantel, James W. Hammett, John Gallagher, Shreveport, for plaintiff-appellee.

LE BLANC, Justice.

This case was previously before this Court and the issue presented is stated in the opinion rendered at that time. See City of Shreveport v. Abe Meyer Corp., 219 La. 128, 52 So.2d 445. As therein indicated there is involved the value of a tract of land containing 298.82 acres which the City of Shreveport wants to expropriate for use as an airport. The property is unimproved land situated on Hollywood Avenue, a black top road, approximately two miles west of the Mansfield Highway which marks the limits of the City of Shreveport at that point.

The original contest before this Court between the city and the land owner was over the admissibility of certain testimony regarding the adaptability of the land for use and development as a sub-division. Certain witnesses were not permitted to give opinion testimony regarding its value for such purpose unless they could also testify concerning its value for all purposes. This they said they were unable to do and with what testimony he had before him the district judge awarded the defendant $275 per acre as the fair value of the land. He also allowed $300 for a small building that is situated on it. The judgment accordingly recognized the right of the City of Shreveport to expropriate the land upon payment to the defendant of the sum of $82,475.

On appeal the ruling of the district judge on the question of the admissibility of the rejected testimony was reversed and the

case remanded so that it could be heard and given weight in determining the true value of the land at the time of the taking by the city. The proof of its suitability for a subdivision was found to be quite pertinent to the inquiry because it was stated, "the rule is well settled in condemnation cases that the most profitable use to which the land can be put, by reason of its location, topography and adaptability, will be considered as bearing upon its market value." The district judge was instructed to receive this additional evidence but it was "to be limited to statements concerning market value at the time of the taking, that is, the price that a prospective purchaser for sub-division purposes would have been willing to pay for the property and not what the land would have been worth if a sub-division had been established thereon."

Carrying out these instructions, although there seems to have been some misconception as to the real meaning of the language used, the district judge heard the testimony of five witnesses produced by the defendant whose opinion as to the market value of the land for the purposes of subdivision at the time of the taking, varied from $500 to $800 an acre. Some of these witnesses based that value which they said they would be willing to pay on the assumption that there had been a tentative Federal Housing Administration commitment on the entire acreage. The trial judge gave no weight to this testimony stating in his reasons for

judgment that, as he appreciated it, it was the very type which this court indicated that it was not interested in hearing. He seemed to have been definitely of the opinion that it was of the character which he had been instructed not to consider, that is, what the land would have been worth *if a subdivision had been established thereon.*

With regard to any commitments which the Federal Housing Administration may have made, the trial judge remarked that so far as the evidence showed, they applied only to a portion of the property. He stated that this commitment "was with reference to a proposition which included the acreage to the north of Hollywood Avenue, which is across Hollywood Avenue from the property, plus about 40 acres on the east end of this 298 acre tract, that there isn't any tentative commitment, as far as we can recall the evidence, on the other 255 acres or better lying to the west of that 40 acre portion of the affected property." Apparently he did not find any reason to change his mind with respect to the figure he had arrived at on the original hearing as to the true value of the property for he reinstated his former judgment.

On application for rehearing the district judge's attention was directed to the testimony of certain witnesses which bore particularly on his statement to the effect that the Federal Housing Administration Commitment applied to only 40 of the 298 acres

and in that connection, he made the following observation:

"In making that statement, the Court had in mind the plot of a proposed subdivision embracing lands of The Abe Meyer Corporation lying north of Hollywood Avenue, and an approximate forty acre tract of land sought to be expropriated lying south of Hollywood Avenue. This proposed plan was submitted to F.H.A. in connection with the activities of the Messrs. Zuzak.

"The Court did not intend to suggest that it disbelieved the testimony of Mr. Lowery or Mr. Stagg or any other witness to the effect that before the Zuzak's had any connection with this property *a representative of FHA had been asked by Mr. Stagg or Mr. Lowery to inspect the whole of The Abe Meyer Corporation property, including that portion lying south of Hollywood Avenue, and had expressed some approving opinion as to its suitability for subdivision purposes.*

"This statement is made at the request of counsel for defendant that the Court clarify the statement which, in that counsel's opinion, might suggest that the Court did not believe the testimony of Lowery and the other witnesses on this point." (Our italics).

Upon the Court's overruling the motion for a rehearing defendant moved for and was granted this devolutive appeal which it is now prosecuting.

On the original hearing several witnesses were called by the plaintiff in order to give their expert opinion as to the market value of the property. Some had previously given a written report of their estimate. They are all realtors familiar with property values in and around the city of Shreveport and qualified to express their opinions. They all appraised the land by the acre and the values placed per acre by them ranged from $175 to $350. Most of these witnesses based their appraisal of the value of the land on the prices that had been paid for land of a similar character in the surrounding area. Most of them were of the opinion that it had no particular value for use as a subdivision basing this opinion on the character of the land which they thought was no better than other farming land around it and also on its location and its lack of necessary public utilities for a subdivision. Only one of these witnesses, J. Pollard Sealy, Jr., gave any consideration to its potential value as a subdivision and he is the one who placed a value of around $350 per acre on it.

The defendant also called several witnesses. They were mostly those whose testimony was that rejected by the district judge because they stated that they could express no opinion as to the value of the land except for subdivision purposes. In other words they were not capable of stating what its value for any other purpose might be.

One of them, R. S. Whitten, testified at some length and was able to consider its value not only from a standpoint of it being adaptable to development as a subdivision but for all purposes as well. This witness appears to have had a large experience in real estate business and particularly in making appraisals of property for insurance companies and other lending agencies. He is a member of the American Institute of Real Estate Appraisals which requires ten years experience in selling and appraising real estate in order for one to become eligible for membership. Other requirements for eligibility indicate that anyone who is accepted must indeed be well informed and besides, must be well recommended as to his character. Mr. Whitten had also made a written report of his appraisal and estimate of defendant's property, addressed to their counsel, in which he goes into detail, all of which is greatly elaborated on in his oral testimony, and concludes that there are 165 acres of open land on the property that have a value of $350 per acre and 130 acres of wooded land having a value of $300 per acre.

It evidently was on the basis of the testimony he had heard on the original hearing that the trial judge reached the figure of $275 per acre which he placed on the property.

On the hearing on the remand all testimony was limited to the value of the property as having a potential value for purposes of subdivision. Five witnesses were heard, all of them testified for the defendant. The testimony of all regarding value for subdivision purposes revolved around the interest which the Federal Housing Administration might take in the property. As a matter of fact some of them stated openly that whilst they were willing to pay as high as $500 an acre for the land, that price would depend upon some form of commitment from the Federal Housing Administration.

Exactly what the Federal Housing Administration commitment amounts to does not appear absolutely clear from the record but from what testimony there is, we understand that the administration does not commit itself directly to the developer of a subdivision but to the purchaser of the homes after they are built, guaranteeing the payment of the purchase price to the extent of 95% to the developer.

Prior to his presenting his proposition to the Federal Housing Administration, the developer has to have a contour map of the property made which he presents to the local office of the administration in order to secure the benefit of its land planning analysis in the hope of obtaining its approval. All of this requires considerable work especially in connection with a property of the size of the one involved in this case. The data is then referred to the land planning section of the Federal Housing Administration at its regional office, (in this case, Dallas, Texas) and it prepares suggested lay-outs for the benefit of the spon-

sors who propose to develop the subdivision.

The contour map of the property in this case, and all necessary data had been prepared by Mr. F. J. Zuzak who was interested in developing it. He had transmitted it to the local office of the administration and they were making some analytical study and work concerning it when the question arose about locating the airport in that area. That, of course, caused the local office to suspend their reports pending the outcome of the bond election relative to the airport. After the airport's decision had been reached the land planning section of the administration was contacted and the data sent to them with the instruction that the suggested lay-out be made only of that portion of the property lying north of Hollywood Avenue which was not to be included in the airport section.

But even before Mr. Zuzak had come to consider the property for development purposes, other persons in that business had shown some interest in it. Mr. Thomas H. Lowery, representing the A. K. Ammen Company had been approached by Mr. T. E. Stagg, president of the defendant corporation and later on Mr. Lowery had Mr. Stagg meet Mr. Ammen. Together they looked over the property and Mr. Ammen became very enthusiastic about it and said the first thing he wanted to do was to get the Federal Housing Administration's approval. According to Mr. Lowery's testimony the matter was submitted to the Administration and all the land was "tentatively approved as suitable for subdivision purposes under the Federal Housing Administration standards."

These two developers as well as others, were impressed with the idea that the property had good possibilities for a subdivision for homes of what they referred to as "the economy type of housing" that is housing for low-income groups to meet the requirements of the laboring class employed in the industries already located in the surrounding area and such as may come there in the future.[1] Not only had they undertaken to secure Federal Housing Administration approval but they had investigated other requirements for a subdivision such as laying out of streets, bringing the required public utilities to it, etc.

We think, therefore, that there was a very serious and substantial consideration given to, and honest efforts made in the direction of developing the land as a subdivision and that certainly, with an approval from the Federal Housing Administration, those people who said they were willing to pay as high as $500 an acre for it were in earnest and in good faith about the matter. They were not allowed to show that they were financially able to develop the project and bring it to the point where the Federal Housing Administration would guarantee the purchase of the homes which would be constructed.

1. That seemed to be the type the Housing Administration would consider also.

The trial judge was in error in his belief that this was all of too speculative a nature to establish a value of the property for subdivision purposes. As stated before he seemed to be of the opinion that these prices per acre were what the property would be worth after a subdivision had been established, but clearly that is not so; those prices were for what these witnesses called the raw land, that is, the land in the state in which it was at the time of the taking. On the basis of the testimony of these witnesses, after a subdivision would have been established, the land would be worth $2,400 an acre, figuring four lots to the acre at $600 a lot. This estimate seems to be fairly reasonable because the type of houses that were to be built and sold would range in price from $5,500 to $6,500 including the lot, and according to them, the price of the lot is generally estimated to be 10% of the price of the house and lot after the subdivision is established.

But we are not to restrict ourselves to the testimony of the witnesses who testified on the remand of the case, some of whom seem to base their opinion of value entirely upon the Federal Housing Administration coming into the picture. We might well resolve any doubt on that contingency in favor of the city and yet we think that in view of all of this testimony in addition to that which was taken on the original hearing the land has a very definite advantage and is suitable for a subdivision.

The testimony of several witnesses for the plaintiff discounted the possibility of it being developed for such a purpose, being of the opinion that it was unfavorably located, being too far from the city and that it would require too much of an outlay in the way of laying out and preparing streets, subdividing it into lots and bringing the necessary public utilities to it. Their valuation was based more on the basic prices per acre which had been paid for land in the neighborhood. Considerable stress is laid on the fact that the city acquired a large tract immediately adjoining that of the defendant's at the rate of $250 per acre but there is nothing in the record to indicate that the owners of that tract had ever had any idea or intention of developing it into a subdivision and certainly nothing to indicate that any steps had ever been taken in that direction. Besides, most of that property is situated at a considerable distance from the defendant's and would seem to be less accessible, generally speaking, to all the requirements of a subdivision. But even comparing it with the defendant's land, as land of the same kind and character, one of plaintiff's own witnesses, Mr. W. Chambers Evans, stated that in his opinion the Abe Meyer land is possibly superior to the other and is better because of its better drainage. We have no difficulty in agreeing with this as the district judge, himself, must have considered it superior and better in some way because he allowed the defendant $25 an acre more than what the city had paid for the other land.

Reverting once more to the suitability of defendant's property for subdivision purposes, we find that on the original hearing one of the city's own witnesses seems to have been definitely of the opinion of its potential value as such. This was the witness J. Pollard Sealy who had had experience in developing property in and around the City of Shreveport. Without any consideration being given to any interest the Federal Housing Administration may have in its development, because that was not mentioned during his examination, he stated that in his opinion the property was worth around $350 an acre.

In considering the testimony given on the original hearing we might state at this point that we are strongly impressed with that of Mr. R. S. Whitten to which we have previously referred. He seems to have made a more serious and careful study of the proposition than any of the other witnesses who testified in the case. He was most ardent in his desire to be fair to both the city and the defendant. He had familiarized himself thoroughly with all elements to be taken into consideration in making his appraisement of the property and, in discussing its adaptibility for a subdivision, readily answered all of the objections which were presented to such a project. We might state at this point that he was not the only witness who countered most of these objections. There are three principal obstacles which it is said would stand in the way of successful development. One, the

fact that in order to reach the property from the city, it would be necessary to pass through a Negro subdivision already established on Hollywood Avenue. The second, the lack of accessibility to the utilities necessary for a successful development, and lastly, it is said that because of the gas pipe lines that are laid beneath the surface, diagonally across the property, people might be dissuaded from buying lands or homes because of the danger involved in having such a hazard on their property.

With regard to the first of these objections we think that it is properly answered in the testimony of the witness Whitten who states that in order to reach any residential area in the outlying districts of the City of Shreveport it is necessary in almost every case to have to pass through areas that are settled by people of the Negro race. Whilst that may be a condition that some people don't like because of the racial relations that exist, it would seem to be a matter that addresses itself to an individual rather than to a whole group of people. For our part we do not see how merely passing through a section that is largely inhabited by one race of people in order to reach your home is a matter which would affect the value of your property in any way.

In regard to bringing in the necessary utilities to the subdivision, that is a matter which would have to be considered by the developer when he goes to lay out the property. It would be an outlay he would have

to make and having made it, he would take it into account when he comes to sell his lots or the homes he has built.

The effect of the presence of the large gas pipe lines is one which is thoroughly discussed in the testimony of several witnesses and seems to be one that could be readily taken care of by the engineering involved in locating the streets and lots on the property. Indeed, according to some of the witnesses, having the pipe line there might be an advantage as it would produce one of the important utilities necessary to the development of the property.

We believe that our analysis of the testimony in the case shows that we have given careful consideration to the question at issue. We do believe that a value of $500 or more as testified to by some of the witnesses is made dependent upon the approval of the Federal Housing Administration and to that extent it may be said that it has an element of speculation in it. We may well discount the interest of that administration, however, and we are still left with the definite conviction that this land has a fair market value as a potential subdivision, removed from the idea of any speculation, and conclude that there is sufficient testimony to place a value of $350 per acre on it. As a matter of coincidence we find that that value is approximately the one arrived at when we take an average of the estimates of all of the witnesses who testified in the case both on the original hearing and the remand.

The judgment appealed from will have to be amended.

For the reasons stated, it is ordered that the judgment appealed from be amended by increasing the amount awarded the defendant from the sum of $82,475 to the sum of $104,887 and as thus amended it is affirmed.

HAMITER, J., dissents and assigns reasons.

FOURNET, C. J., absent.

HAMITER, Justice (dissenting in part).

For the reasons which I assigned on the former consideration of this cause, 219 La. 128, 137, 52 So.2d 445, 448, I am of the opinion that the judgment as rendered by the district court should be affirmed.