280 So.2d 406 (1973)
MID-LOUISIANA GAS COMPANY
v.
John E. SANCHEZ et al.
MID-LOUISIANA GAS COMPANY
v.
Minerva P. BRIGNAC.
MID-LOUISIANA GAS COMPANY
v.
Edward MARTIN et al.
MID-LOUISIANA GAS COMPANY
v.
Earl J. MARTIN.
MID-LOUISIANA GAS COMPANY
v.
Harry M. MARTIN.
MID-LOUISIANA GAS COMPANY
v.
Louis MARTIN.
MID-LOUISIANA GAS COMPANY
v.
Amilcar POLLET et al.
MID-LOUISIANA GAS COMPANY
v.
Dorrel POCHE et al.
MID-LOUISIANA GAS COMPANY
v.
Michel MARTIN, Jr., et al.
Nos. 5324-5332.
Court of Appeal of Louisiana, Fourth Circuit.
June 5, 1973.
Rehearings Denied July 3, 1973.
Writs Refused September 7, 1973.
*408 Vernon W. Woods, Patrick H. Baker, New Orleans, and Martin, Himel & Peytavin, Lutcher, for plaintiff-appellee.
Leach, Grossel-Rossi & Paysse, F. A. Courtenay, Jr., and Monroe & Lemann, Eugene G. Taggart, New Orleans, for defendants-appellants.
Before REDMANN, LEMMON and GULOTTA, JJ.
GULOTTA, Judge.
These are consolidated suits for the expropriation of subsurface strata[1] for the underground storage of offsite natural gas. The subsurface area in the consolidated cases before us comprises 92 acres of a total 616.80 acres. No surface area is to be taken. From a judgment ordering the expropriation[2] and the payment of the sum of $80.00 per acre, the defendant landowners appeal.[3]
It is the contention of defendants that there is no specific statutory authority authorizing the expropriation of subsurface strata for the storage of natural gas.[4] They argue that Acts 208 of 1906 and 123 of 1910 and LSA-R.S. 19:2[5] (the general expropriation statute) which authorize the expropriation by utility companies "for the piping and marketing of natural gas for the purpose of supplying the public with natural gas" does not include the right to expropriate underground storage areas. In support of their contention, they rely on that line of jurisprudence which states that expropriation statutes must be strictly construed.[6]
Furthermore, according to defendants, no force of law should be given to the acts of 1906 and 1910 as well as to LSA-R.S. 19:1 et seq because the source acts of these revised statutes are broader in scope than are the titles. Specifically, they complain that the titles of Act 208 of 1906 and 123 of 1910 (source acts) allow expropriation for laying pipeline, while the body of those acts include expropriation for the piping and marketing of natural gas for the purpose of supplying the public.
*409 Finally, while the landowners do not question the need for underground storage areas by public utilities, they argue, in the instant case, there is no need to take their property because under LSA-R.S. 30:22(B)(1)(b)[7] the gas company has the right of use of the entire area (including that of defendants), once they have acquired the right of use of 75 percent of the entire area. This, they argue, the gas company has done.
Alternatively, defendants insist that $80.00 per acre is not sufficient and just compensation, and they should be awarded $1,738.00 per acre for the taking. They suggest that under no circumstances should they be paid less than $372.84 per acre.
Plaintiffs, on the other hand, take the position that while the acts of 1906 and 1910 and revised statutes relied on by the defendant are not explicit in authorizing expropriation for storage or reservoir purposes, there is no prohibition against expropriation for the purposes sought herein. They contend, moreover, the storage of offsite natural gas is consistent with the "piping and marketing of natural gas for the purpose of supplying the public" as set forth in the acts. This, according to plaintiff, has been recognized by the Legislature in the adoption of LSA-R.S. 30:22(B) providing for authorization by the Commissioner of Conservation for the use of underground storage of offsite natural gas.[8]

RIGHT TO EXPROPRIATE
While it is true there is no specific statutory authority which particularizes that a corporation created for the piping and marketing of natural gas has the right to expropriate subsurface strata for storage or reservoir purposes, nevertheless these statutes encompass within their intent and meaning utilization of property by these corporations for the purposes sought herein. It is significant that the language contained in the body of Act 208 of 1906 and Act 123 of 1910 as well as in LSA-R. S. 19:2(7) authorizes expropriation by corporations created not only for the piping of natural gas as suggested by the defendants but also the "marketing" of natural gas for the purpose of supplying the public. There is evidence that public utilities are faced with a shortage of fuel. In order to meet the demands of the particular area to be serviced by plaintiffs, it is necessary that the natural gas be extracted in time of less need (summer) and to be stored in reservoirs to be used during a time of need (winter). It appears, therefore, that, according to plaintiffs, the utilization of underground storage area and *410 reservoirs is necessary for the marketing of natural gas and supplying the public requirements. We cannot accept the restricted and limited meaning of the statutes, as suggested by the defendants (that expropriation is available only for pipeline use), to defeat a meaning consistent with the development of technology in a progressive era. Statutory construction cannot be so interpreted.
Furthermore, LSA-R.S. 30:22 adopted in 1962 specifically provides for the issuance by the Commissioner of Conservation authority for the gas company to utilize the property for the underground storage of natural gas. It provides further that prior to the use of any underground reservoir or other exercise of the right of eminent domain by the public utility, the Commissioner must have found that the reservoir is suitable and feasible. Other requirements are set forth in the act pertaining to the use of property for this purpose. In this respect, the statute is restrictive. Before the broad right of expropriation may be exercised under LSA-R.S. 19:1 et seq, the conditions and requirements set forth in LSA-R.S. 30:22 must be met. Nevertheless, it is clear that the language of LSA-R.S. 30:22 presupposes the right of a public utility to expropriate property in this situation. Were we to hold otherwise, the effect of LSA-R.S. 30:22 would be completely nugatory. This is untenable. We simply cannot adopt an interpretation which would lend to a conclusion that the legislature would pass statutes which are completely vain and useless. Moreover, LSA-C.C. art. 17 provides:
"Laws in pari materia, or upon the same subject matter, must be construed with a reference to each other; what is clear in one statute may be called in aid to explain what is doubtful in another."
When we interpret LSA-R.S. 19:1 et seq in pari materia with LSA-R.S. 30:22, our conclusion is strengthened that a corporation created for the piping and marketing of natural gas has the right under LSA-R.S. 19:2 to expropriate underground reservoirs for the marketing of natural gas and supplying the public, provided the need exists.
But defendants insist that while they do not contest a need exists for storage of natural gas, nevertheless, in the instant case, they do contest the need to expropriate the remaining 92 acres owned by them, since under LSA-R.S. 30:22(B) the public utility is entitled to the use of the entire underground reservoir including the area owned by the defendants when the utility company has acquired 75 percent of the area. We find no merit to this contention. As herein before pointed out, LSA-R.S. 30:22(B) does not confer the right of expropriation nor the right of use. It presupposes that these rights are conferred from some other source. The right to expropriate is conferred in LSA-R.S. 19:1 and 19:2. In this case, the right of use is gained when the right of expropriation is exercised provided the conditions set forth under LSA-R.S. 30:22, subd. B(1)(b) are met. The right of use was acquired by contract from all of the property owners exclusive of the defendants. Without the acquisition of the right of use from the defendants by agreement and without statutory authority providing for the right of use (we have been cited none, nor can we find any), this right is acquired through expropriation. Without the right to expropriate in this case, there can be no right of use.
We further find no merit to defendant's suggestion that because the body of Acts 102 of 1906 and 123 of 1910 (the source acts for LSA-R.S. 19:1 et seq) is broader than the title, they are not to be afforded force of law. The issue before us is not whether the source acts and LSA-R.S. 19:1 et seq are unconstitutional but whether these provisions should be interpreted in light of the intent of the source acts.
In this respect, the titles of Act 208 of 1906 and Act 123 of 1910 describe an act "relating to * * * the expropriation of *411 property for the laying of pipelines for natural gas for supplying the public with natural gas." (emphasis ours) However, the body of these acts creates the power of expropriation of land necessary "for the piping and marketing of natural gas for the purpose of supplying the public with natural gas." (emphasis ours)
Arguably, the wording in the title of these source acts indicates the intention of the legislature to grant the power of expropriation for the sole purpose of laying pipelines. Nevertheless, the substantive intent of the source acts is to confer the power of expropriation on certain corporations for the purpose of supplying the public with natural gas. Although the title indicated only one facet of the overall purpose, it is unreasonable to limit an interpretation of legislative intent to the facet indicated in the title when the body clearly provides the overall purpose. While the title includes the right to expropriate property for the laying of pipelines, this is only one phase of the entire process resulting in the marketing and supplying the public with the use of natural gas. The obvious intent of the redactors was to permit expropriation for land for the use of pipelines for the piping of natural gas and for other purposes consistent with the marketing and supplying of gas to the public. The body of the act authorizes the expropriation of land necessary for any phase of the overall process.
Accordingly, we hold Mid-Louisiana has the right to expropriate the subsurface strata belonging to the defendants for the use of an underground reservoir for the storage of natural gas upon the payment of just and sufficient compensation.

JUST COMPENSATION
However, the landowners contend that the trial judge erred in determining just compensation[9] based on $80.00 per acre. They seek payment of the sum of $1,738.00 per acre computed upon the replacement cost of the native gas. In this connection, the defendants offered the testimony of Lee M. Meltzer, a consulting petroleum geologist, who stated the reservoir must have a cushion,[10] or sufficient gas, to maintain operating pressure of 1,000 pounds. He stated the native gas provides 588 pounds of pressure in the reservoir or 60 percent of the needed cushion. According to Meltzer, it is necessary that the gas company furnish only an additional 40 percent of the offsite gas for the needed cushion. Therefore, Meltzer suggests the value of the subsurface strata must be based on the value of the natural gas now in the reservoir or the cost to the gas company to purchase and inject the offsite gas in sufficient quantity to provide the cushion. He determines this value to be $1,738.00 per acre. While we can accept the presence of the native gas in the reservoir as an element in determining its market value, we cannot accept the "replacement" theory suggested by Meltzer. It is based on a faulty supposition that were the gas not present in the reservoir, it would have to be purchased and injected. In the words of the trial judge, "The gas is there, and any supposition to the contrary is pure speculation * * *."
While Meltzer's replacement theory is not the accepted method of determining market value under LSA-R.S. 19:9,[11] nevertheless, evidence of value of materials or deposits on condemned land is *412 admissible in establishing market value, though not in itself a yardstick of just compensation. State Through Department of Highways v. Hayward, 243 La. 1036, 150 So.2d 6 (1963). Therefore, in the instant case, evidence of the replacement value of the cushion gas is admissible though it is not the only standard for establishing market value as suggested by defendants. Furthermore, the Louisiana Supreme Court in the early case of Orleans & J. Ry. Co. v. Jefferson & L. P. Ry. Co., 51 La.Ann. 1605, 26 So. 278, at page 284 (1899) recognized that if the property is exceptionally adapted and available for such use, the owner may be entitled to any enhanced value due to its adaptability for valuable uses. In other jurisdictions, this theory has been applied to a servitude of use similar to the one in the instant case. In the Michigan case of Consumers Power Company v. Allegan State Bank, 20 Mich.App. 720, at page 737, 174 N.W.2d 578, at page 587, the court in quoting 27 Am.Jur.2d Eminent Domain, Sec. 282, pp. 77-79 stated:
"On the other hand, where, entirely apart from the fact that the property was taken for a particular use, it appears that it was exceptionally adapted and available for such a use, as, for example, for a municipal water supply, or for a railroad, or for a bridge, and the necessity for such use was so imminent as to add something to the present value in the minds of possible buyers, that element may be considered in determining the fair market value."
Moreover, as pointed out to us by defendants, in the case of United States v. Chandler-Dunbar Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1912), the United States Supreme Court held that although generally the enhancement of the property by the purpose for which it is taken may not be considered, the element of value due to the special use to which parcels of land were to be placed by the condemnor for lock and canal purposes should be considered due to the exceptional adaptability of the parcels of land for just such use. The following language in the opinion at page 77, 33 S. Ct. at page 677 is particularly significant:
"* * * Although it is not proper to estimate land condemned for public purposes by the public necessities or its worth to the public for such purpose, it is proper to consider the fact that the property is so situated that it will probably be desired and available for such a purpose." (emphasis ours)
It is our opinion, therefore, that evidence as to the adaptability of the property in question is admissible as an aid in determining the value to be placed on defendants' natural gas reservoir, though admittedly not the only standard in determining market value. Therefore, considering this standard as only one element of value, we cannot conclude that $1,738.00 per acre as suggested by defendants is a reasonable one, nor, however, can we conclude that $80.00 per acre is just compensation.
Defendants alternatively suggest that on the basis of "representative transactions" they should not be compensated less than $372.84 per acre. They base this sum on the amount paid to Southdown Lands, Inc., for use of its subsurface reservoir area in the same field as that of appellants (Hester Gas Field). They argue where there are no comparables on which to base a fair value, a "representative transaction" should be considered. The representative transaction, according to the landowners, is the Southdown agreement. This agreement provides for 20 years annual payment of $9,000.00 for 228.45 acres inside the reservoir area. This includes, under the agreement, the use of eight surface acres including one four-acre site for a compressor station, as well as two sites of two acres each, for locations to drill, rework, or install wells to inject the gas, together with the use of an existing road and right of way for an additional road and the right to store gas in two sands, i. e., the 9,600 foot to 9,800 foot depth and the 10,200 foot sand level. Specific values *413 were not particularized for each right of way. James Bradley Oubre, a real estate appraiser, defendants' expert, determined the surface value of the property conveyed in the Southdown agreement is $8,000.00[12] and a fair annual return on that property is $960.00 per year. Therefore, he concluded the remaining annual $8,040.00 of the $9,000.00 amount paid to Southdown is the value of the underground storage area. Oubre then multiplied the annual rental of $8,040.00 by 20 years (the term of the servitude) and then converted to present value determining the rental over that period to have a present value of $85,175.60. This sum he prorated over 228.45 acres of Southdown's property and determined the value of each acre to be $372.84. He added an additional $129.90 per acre representing a reversionary interest since the gas company seeks the use of defendants' property for a longer period than 20 years as provided in the Southdown agreement. Oubre suggests that the property reverts to Southdown after 20 years but not to the defendants in the same amount of time. Therefore, plaintiff should pay an additional $129.90 per acre for the longer use. We find no basis for including this additional amount ($129.90 per acre) to the purchase price of the Southdown property because we find no reason for extending the servitude in the instant case for any longer period than 20 years. The trial judge so held, and we agree. We further cannot accept Oubre's suggestion that defendants should be compensated an additional $168.17 per acre over and above the $372.24 per acre figure paid to Southdown because their property is unencumbered and Southdown's property was burdened with a mineral lease. Any additional consideration based on the value of a mineral lease is speculative. Moreover, the fact that defendants' property was not burdened by a lease may have been one of the very reasons plaintiff selected defendants' land. Again, this is in the realm of speculation and cannot be considered in determining market value.
Plaintiff, on the other hand, argues that the Southdown agreement is not a valid comparable. They point out that market value has been defined in our jurisprudence as that value established in a voluntary sale reached between a willing seller, and an informed buyer, under ordinary and usual circumstances. Plaintiff reasons that the agreement with Southdown was not an agreement between a willing seller and willing buyer under ordinary circumstances, because in order for the utility company to acquire 75 percent of the area as required under LSA-R.S. 30:22, subd. B(1)(b), it had to come to agreement with Southdown since they owned 37 percent of the property. While some consideration must be given to this fact, nevertheless, the sum of $372.84 per acre was paid. Had Southdown demanded an unreasonable amount of compensation, plaintiff could have gone elsewhere to build its reservoir. The record reflects that, although the Hester Field might have been the preferred area, it was certainly not the only available one.[13] We cannot disregard this sale, although some downward adjustment must be allowed in the instant case because additional rights were conveyed in the Southdown agreement not included in defendants' property.
While it is well settled that in determining fair market value, we look to comparable sales;[14] however, because gas reservoirs for storage is a relatively new concept in Louisiana, we have few comparables to use as guides. Kermit Williams, a real estate appraiser, testified that the price paid for a similar servitude in three other fields in Louisiana was $35.00 per *414 acre.[15] He then made an annual upward adjustment and arrived at a $40.00 per acre amount for the instant servitude. We find it significant, that, in addition the amount paid to the State of Louisiana by United Gas Pipeline for underground storage in the Lake Bistineau Field in Bienville and Bossier Parishes (two of the comparables suggested), the State of Louisiana was paid a bonus of $40,610.75, or $15.75 per acre (i.e., approximately 2,663 acres). While the record is not clear on what basis the bonus was computed, suffice it to say that the owner in the Bistineau Field (the State of Louisiana) was paid more than $35.00 per acre for the servitude.
Moreover, we are not furnished with information on the size of the cavity or the market location or the amount of native cushion gas in place in the Bistineau sale or the other sale in Lincoln Parish. Furthermore, according to Clark Webster, a petroleum landman, the Bestineau Field was encumbered (unlike defendants' lands) by a 7/8 mineral lease. A portion of the lands in the two other North Louisiana Fields were also under mineral lease. While we do not attach the same significance to these three sales as did the trial judge, they must be considered when determining market value.
However, we deem the Southdown sale a more valid comparable than the Bistineau and Lincoln Parish sales. We are influenced by the similarity in the size of the cavity and the similarity in the amount of cushion gas; the proximity of the Southdown property to the defendants; the term of the servitude; the proximity of the property to the gas companies' market as well as the sales of surface acreage in the area of defendants' property. This, the trial judge apparently failed to do, and in this respect, we find he erred.
Therefore, taking into consideration a downward adjustment of the Southdown sale because of the additional subsurface strata conveyed to Southdown and the surface rights as well as the size of the area owned by Southdown, we conclude that just compensation to the landowners for the expropriated subsurface storage strata in the instant cases is on the basis of $285.00 per acre.
Finally, we find no abuse of the trial judge's discretion as contended by defendants in the amount of the award of the expert fees.[16]
Accordingly, the judgment of the trial court is amended consistent herewith. So amended, the judgment is affirmed.
Amended and affirmed.
LEMMON, Judge (concurring specially with additional written reasons).
I have signed the majority opinion and subscribe fully to the result reached. In my opinion the right of expropriation and the amount of the award of just and adequate compensation are fully supported by the evidence and the applicable law. While Oubre's appraisal method was a reasonable approach, however, I would prefer a different method of determining just and adequate compensation for the expropriation of underground reservoirs.
This is a special use situation which gives rise to different factors than those normally considered when appraising property. While plaintiff chose this particular area for several reasons, such as proximity to its market and to its pipeline supply and the presence of existing well facilities, the greatest asset attributable to this particular reservoir was the presence of cushion gas at a pressure of 588 p. s. i. absolute.
*415 A reserve of cushion gas at 1,000 pounds is necessary to the physical operation of the reservoir. It is therefore necessary for the reservoir operator in this case to inject sufficient gas to provide this minimum pressure. Obviously, if the same strata already contained cushion gas at 1,000 pounds of pressure, the value of the strata would be much greater for this special use, in that the operator would not have to purchase gas from another source, transport it and inject it into the reservoir. On the other hand, if the pressure in the strata were less than 588 pounds, the value for the special use would be less.
Accordingly, while the pressure of cushion gas is not the sole criteria in determining the just and adequate compensation which should be paid for the reservoir, it is by far the most important one. I would therefore prefer to determine the just and adequate compensation in this type of case primarily on the "in place" value of the existing cushion gas.
Defendants' expert based his suggested value of $1,738.00 per acre on the cost of buying gas produced elsewhere at $0.34 per 1,000 cubic feet (m. c. f.), minus $0.02 per m. c. f. for single stage compression. This basis ignored the fact that a substantial portion of the $0.34 is attributed to the cost of producing the gas elsewhere and transporting it to the reservoir. Inasmuch as it is not necessary to produce or transport the gas already in the reservoir, that cost should for the most part be subtracted in determining the "in place" value of the cushion gas. Perhaps there are additional methods of determining the "in place" value of the existing cushion gas.
Oubre's appraisal method is limited by (1) the necessary exercise of judgment in allocating various portions of the lease price to the various rights bargained for, and (2) the inherent weakness of the capitalized income approach in comparison to the market data approach. His method necessarily considered the value of the cushion gas, but the paramount importance of that value was either lessened or increased, depending upon the value assigned to the other rights acquired in the Southdown agreement on which he based his appraisal.
I would therefore prefer to determine just and adequate compensation for the reservoir primarily on the value of the asset of paramount importance, the cushion gas, which in this case apparently is at least the amount awarded. In future cases involving expropriation of a reservoir, my suggested approach would provide a more consistent method and would also be workable in the absence of a "Southdown lease."
Moreover, the subsurface strata (the hole in the ground) is itself of little value and is not in short supply in the area. The existing cushion gas gives the strata most of its value and is the commodity in short supply. Indeed, since this particular gas, not being producible in paying quantities, has little or no value to the owner when considered in terms of ordinary gas production for pipeline supply, the distinction between this case involving a special use and the normal expropriation case is that the value to the expropriating authority forms an important consideration in determining just and adequate compensation.
Finally, I would prefer to award the servitude expropriated without a time limitation, with extinguishment to take place as provided in the Civil Code. Assuming that a perpetual servitude would be awarded, Oubre adjusted the comparison to Southdown's 20-year lease by estimating Southdown's reversionary interest and adding that per acre value to the compensation to be awarded defendants, who would receive no reversionary benefits. If compensation were based primarily on the value of existing cushion gas, with a small portion of the award allotted for the value of the use of the cavity, there would be no reversion, and another need for exercise of judgment would be eliminated.
*416 REDMANN, Judge (dissenting).
La.Const.1898 art. 31 (source of Const. 1921 art. 3 § 16) required the one object of an act be "expressed" in its title. The title of La.Acts 1906, No. 208, expressed its object as the amendment and re-enactment of an earlier act "relating to the expropriation of property for purpose of charity and public schools and providing herein by said amendments for the expropriation of property for the laying of pipelines for natural gas for supplying the public with natural gas."
The body of the act recites that whenever "any corporation constituted under the laws of this State * * * for the piping and marketing of natural gas for the purpose of supplying the public with natural gas * * * cannot agree with the owner of land which may be wanted for its purchase, * * *" the corporation could expropriate by petition "describing the land necessary for the purposes * * *" etc.
It is not reasonable to interpret this Act as authorizing expropriation of any land desirede. g., for the company's office building, or indeed for the production of natural gas. Since no other language of the body accomplishes the title's purpose, the reasonable construction of this language authorizes expropriation only for pipelines.
When the 1906 Act (with interim amendments not here pertinent) was embodied in La.R.S. 19:2 (1950), R.S. 1:16 directed that the revision "shall be construed as continuations of and as substitutes for the laws or parts of laws which are revised and consolidated herein. * * *"
Therefore R.S. 19:2 must be construed as a continuation of the 1906 Act, and not as providing a power of expropriation that the 1906 Act did not provide.[1]
Accordingly plaintiff does not have the power to expropriate except for laying pipeline and its petition for expropriation of an enormous gas stratum with billions of cubic feet of gas at 588 psi should be dismissed at its cost.
NOTES
[1] This strata is designated the Discorbis D-2 zone between the depths of 9,600 feet and 9,800 feet.
[2] According to the judgment, the expropriation was ordered under several conditions. The first is that the servitude is limited to the Discorbis D-2 zone herein described. Secondly, the landowners may not allow a well to be completed in the said sand and must protect against the loss of gas from said sand should a well be drilled in another sand. Thirdly, appellee may not withdraw any of the natural gas in place. Fourthly, the servitude ends September 30, 1990 and fifthly, landowners may sue should they sustain damage due to the loss of royalties.
[3] Appellants are: Minerva P. Brignac, Edward Martin et al, Earl J. Martin, Harry M. Martin, Louis Martin, Amilcar Pollet, et al, Dorrel Poche, et al, and Michel Martin, Jr., et al and John E. Sanchez.
[4] Strain v. Cities Service Gas Company, 148 Kan. 383, 83 P.2d 124, relied on by appellants. This case has been overruled by the Legislature of that state in Kansas General Statutes Annotated, Sec. 55-1202 et seq.
[5] LSA-R.S. 19:2 in pertinent part reads as follows:

"Where a price cannot be agreed upon with the owner, any of the following may expropriate needed property:
* * * * *
"(7) Any domestic or foreign corporation created for the piping and marketing of natural gas for the purpose of supplying the public with natural gas; * * *"
[6] Louisiana Highway Commission v. Cormier, 128 So. 56 (La.App. 1st Cir. 1930); Orleans-Kenner Electric Ry. Co. v. Metairie Ridge Nursery Co., 136 La. 968, 68 So. 93.
[7] LSA-R.S. 30:22(B) (1) (b) reads as follows:

"B. Prior to the use of any underground reservoir for the storage of natural gas and prior to the exercise of eminent domain by any person, firm or corporation having such right under laws of the state of Louisiana, and as a condition precedent to such use or to the exercise of such rights of eminent domain, the commissioner, after public hearing pursuant to the provisions of R.S. 30:6, shall have found:
"(1) That the underground reservoir sought to be used for the injection, storage and withdrawal of natural gas is suitable and feasible for such use; provided no reservoir, any part of which is producing or is capable of producing oil in paying quantities, shall be subject to such use, unless all owners in such underground reservoir have agreed thereto, and no reservoir shall be subject to such use * * * (b) unless such reservoir has a greater value of utility as an underground reservoir for gas storage than for the production of the remaining volumes of original reservoir natural gas and condensate content, and at least three-fourths of the owners, in interest, exclusive of any `lessor' defined in R.S. 41:1261, have consented to such use in writing; * * *"
[8] The Commissioner's Order No. 834-A issued January 26, 1971 recognized the need of the public utility and the suitability of the underground areas as well as the unproductivity of the subsurface strata. It authorized the use of the area sought to be expropriated in the instant case.
[9] Louisiana Constitution of 1921, Art. 1, Section 2.
[10] A cushion is that gas at the base of the reservoir which supplies the energy and in essence acts as a pump to aid in getting the stored gas out of the reservoir.
[11] LSA-R.S. 19:9 reads:

"In estimating the value of the property to be expropriated, the basis of assessment shall be the value which the property possessed before the contemplated improvement was proposed, without deducting therefrom any amount for the benefit derived by the owner from the contemplated improvement or work."
[12] John Thrash, plaintiff's expert, agreed with this value.
[13] Other available fields are: University Field near Baton Rouge; Bayou White Field in Pointe Coupee; Fordache Field, Laplace; Bayou Segnette, South of New Orleans.
[14] State v. Bjorkgren, 147 So.2d 905 (La. App. 1st Cir. 1962).
[15] These are Lake Bistineau Field in Bienville and Bossier Parish developed in 1966, the Ruston Field in Lincoln Parish developed in 1968 and the Unionville Field in Lincoln Parish, developed in 1968.
[16] Barnett v. Barnett Enterprises, Inc., 231 So.2d 589 (La.App. 4th Cir. 1970).
[1] If the body of the 1906 Act had expressly authorized expropriation of land for its gas strata the Act would have been unconstitutional. But its unconstitutionality would have been cured by its inclusion in the Revised Statutes, according to State v. Rones, 223 La. 839, 67 So.2d 99 (1953).