485 So.2d 72 (1986)
SOUTHWESTERN ELECTRIC POWER COMPANY, Plaintiff-Appellee,
v.
C.R. SCURLOCK, et al., Defendants-Appellants.
No. 17463-CA.
Court of Appeal of Louisiana, Second Circuit.
February 26, 1986.
Rehearing Denied March 27, 1986.
*73 John S. Odom, Jr., Shreveport, for defendants-appellants.
Wilkinson, Carmody & Gilliam by Bobby S. Gilliam, Shreveport, for plaintiff-appellee.
Before MARVIN, FRED W. JONES and LINDSAY, JJ.
*74 MARVIN, Judge.
In this utility expropriation under LRS 19:2(7), the appealing landowners and the power company (SWEPCO), who answered the appeal, complain respectively of the inadequacy and excessiveness of the judgment awarding the landowners $62,390 as just compensation for the property taken, part in servitude and part in full ownership. SWEPCO expropriated the property to construct an intake structure on Toledo Bend Reservoir and a pipeline therefrom to supply water to the SWEPCO electrical power plant in the Dolet Hills south of Mansfield.
Besides the issue of just compensation, we consider parenthetically the timeliness of the landowners' appeal and the landowners' contention that a new trial should have been granted to allow them to recover damages allegedly inflicted upon their lands by SWEPCO's construction after trial of the expropriation action.
We find the appeal timely and, with an amendment to correct an obvious clerical error in the judgment, affirm the trial court in all respects.

TIMELINESS
By minute entry made and mailed to the litigants on March 11, 1985, the trial court denied the landowners' motion for a new trial. On April 11 or 12 the trial judge signed the order attached to the landowners' petition, granting an appeal, and gave it to the district clerk of court. The district clerk thought that a judgment denying the new trial was necessary to perfect the appeal. The clerk so informed the landowners' counsel, who then prepared such a judgment and mailed it to the clerk. That judgment was signed on April 30. The clerk discarded the landowners' first petition and signed order granting the appeal apparently when a second petition for, and order granting, an appeal was signed on May 21. After noticing the apparent untimeliness and requesting a response, we remanded for a hearing which revealed the circumstances recited above.
The district clerk's instructions to the appellant about the necessity of a signed judgment and his later discarding of the petition and signed order granting the appeal should not be imputable to appellant, as SWEPCO now contends. Compare Boyd v. Fourchon, Inc., 408 So.2d 380 (La.App. 1st Cir.1981); Pepitone v. State Farm Mut. Auto Ins., 365 So.2d 1195 (La. App. 4th Cir.1979); Thibodeaux v. Western World Ins. Co., 387 So.2d 601 (La.App.3d Cir.1980). The clerk explained that he did not send SWEPCO a notice of the first and timely appeal because he expected the signed judgment and second appeal from the appellant. The failure of the clerk to mail the notice to an appellee "does not affect the validity of the appeal." CCP Art. 2161. Compare Dupre v. Land Resources, Inc., 409 So.2d 1313 (La.App.3d Cir.1982). SWEPCO was not prejudiced and indeed answered the appeal before the return day as CCP Art. 2133 permits.

MOTION FOR NEW TRIAL
The Scurlocks alleged that after the judgment was signed, SWEPCO's pipeline construction crews damaged a water pipe and private road owned by them. They contend that they should be allowed to assert these demands in a new trial in the expropriation action because the damages could not have been discovered before or during trial through diligent investigation. CCP Art. 1972.
SWEPCO contends that a cause of action for damages incurred after the judgment cannot be instituted by the re-opening of the expropriation proceedings. We must agree.
An applicant is entitled to a new trial when he has discovered new evidence after trial "important to the cause." CCP Art. 1972(2). Our emphasis. A party, of course, cannot discover, before or during trial, damage that occurs after judgment. Nevertheless, the damages alleged are tort damages, unrelated to the "cause" of an expropriation proceeding. The expropriation *75 cause of action inquires into the just compensation and severance damage for the property taken and is distinct from a cause of action for tort damages that may later arise. The worsened condition of an injured plaintiff that occurs after trial in a personal injury action was not "newly discovered evidence" warranting a new trial within the meaning of CCP Art. 1972(2). Burleigh v. State Farm Ins., 469 So.2d 270 (La.App.3d Cir.1985).
Although appellants may have a remedy for the alleged tort damages (another cause of action), that cause of action may not be instituted by application for new trial in an expropriation action which has been tried.

THE MERITS
SWEPCO's authority and necessity to expropriate under LRS 19:2 et seq are not contested. The plat reproduced below depicts the property taken. Tract A is .989 acres taken in full ownership for the construction of a water intake facility similar to that of International Paper Company's intake site immediately to the south, and a 25-foot servitude for a 36" water pipeline from Tract A extending across Tracts B & C. The pipeline servitude is "permanent" and the construction servitude is temporary, ending when the pipeline is completed and operating.
The property is in an area known as Hart's Bluff on the Sabine river about 11 miles southwest of Mansfield.
*76 
Before Toledo Bend dam was completed, Hart's bluff was a distinct landmark, steep and high above the river. After the reservoir filled, land on and around the bluff became desirable property. The Scurlocks owned about 164 acres in the area and then sold lots on and off the lakefront to residential and industrial buyers. Several fishing camps and a marina are on the lakefront in the area. Hart's Bluff is one of several desirable areas surrounding Toledo Bend from which water may be drawn from the deep river channel. Since 1979 the City of Mansfield and International Paper *77 Company have constructed water intake facilities at Hart's Bluff to supply their respective needs.
These attributes of the property provoke the dispute between appraisers for the landowners and SWEPCO as to the comparable sales from which to determine market value of the expropriated property. One of SWEPCO's appraisers, Landon, considered as comparables, five water intake sites and 25 lakefront residential lots. Two of the water intake sites are 10-20 miles distant and are not on Hart's Bluff. SWEPCO's other appraisers considered the intake sites at Hart's Bluff and elsewhere but rejected them as comparables. The landowners' appraiser, Dupree, used three Hart's Bluff intake sites, two of which were transferred by the landowners, and one of which was transferred by a neighbor, as comparables.
Without detailing the opinion evidence and comparables upon which it was based, we simply tabulate the respective appraisals and the court's award. The award "A" is for the intake site taken in full ownership. The award "B" is for the pipeline servitudes, permanent and temporary. The award "C" is for timber on the servitude.

 (SWEPCO) (SWEPCO) (SWEPCO) (L/OWNR)
 SISTRUNK LANDON WILLIAMS DUPREE COURT
A $25,500. $27,350. $17,500. $108,790. $54,570.
B 2,250. 5,950. 3,353. 8,250. 5,950.
C 1,817. 1,817. 1,817. 1,817. 1,870.
 ______ ______ ______ ______ ______
 $29,567. $35,117. $22,670. $118,857. $62,390.

All appraisers agreed that the value of the timber on the servitude tracts was $1,817. The trial court's reasons use this figure. The judgment mistakenly transposes this amount to $1,870. We shall correct this obvious clerical error.
The trial court, in written reasons for judgment, discussed the five intake sites, found the Hart's Bluff area to be "favorable for water intake purposes and, ... the highest and best use ... [for] an industrial water intake site." The court rejected SWEPCO's contention that the highest and best use was for recreational purposes. SWEPCO vigorously argues that the court erred in both respects. The landowners vigorously argue to increase the award. The record supports the judgment, however, and we affirm.
The award of $62,390 neither wholly accepts or rejects any one of the appraisals. Contrary to SWEPCO's contention, the fact that the award approaches a "midpoint" between the appraisals does not, in itself, indicate that the trial court disregarded the landowners' appraisal and substituted its own opinion. See and compare Cajun Elec. Power Co-op v. Estate of Thomas, 408 So.2d 1001 (La.App.2d Cir.1981); and State, Department of Highways v. Thurman, 231 So.2d 692 (La.App. 1st Cir.1970).
Similarly, SWEPCO's contention that the trial court should have wholly disregarded the landowners' appraisal because Dupree's comparables were not "market value transactions" is without merit. Under the market value approach to property valuation, the accepted method of analysis is to "consider comparable sales, adjusting them to compensate for their relative good and bad features with regard to the expropriated property." State, Dept. of Transp. & Development v. Winn, 463 So.2d 648 (La.App. 4th Cir.1984); State Through Dept. of Highways v. Romano, 343 So.2d 222 (La.App. 1st Cir.1977). Accordingly, if the method by which an expert appraiser molds relevant comparables into a final estimate of market value satisfies basic notions of sound, logical reasoning and sincerity, the trier of fact may give weight to that appraisal. State, Dept. of Transp. & Develop. v. Henry, 468 So.2d 1262 (La.App.3d Cir.1985); Cajun Electric Power Co-op., supra; Thurman, supra.
All four appraisals have some strengths and weaknesses. The trier of fact is empowered *78 to evaluate the evidence in that light and make "factual determinations as to which of the facts relied on by the witnesses relevantly influences market value..." Valley Elec. Membership Corp. v. Wallace, 465 So.2d 986 (La.App.3d Cir. 1985). Because the trial court adopted Dupree's comparables as the better evidence of market value does not require the trial court to accept Dupree's appraisal in toto nor does it require it to wholly reject other valid, logical, and sound evidence of market value offered by SWEPCO. The relative strengths and weaknesses of various appraisals is a matter of factual weighing and not a basis for wholly excluding consideration of other appraisals. A reviewing court must give the trier of fact's determinations the same weight as any other finding of fact. Faustina Pipe Line Co. v. Broussard, 450 So.2d 17 (La.App.3d Cir.1984).
The landowner is entitled to the market value of his or her expropriated land as "just compensation" for the taking. LSA-Const. Art. 1, § 4; LRS 19:9. The market value approach simply examines the worth of the land in light of the highest, best, and most profitable use to which it may be reasonably put in the near future by reason of its "location, topography, and adaptability." City of Shreveport v. Abe Meyer Corp., 52 So.2d 445, 447 (La.1951), amended and affirmed, 223 La. 1079, 67 So.2d 732 (1953); State, Department of Highways v. Rapier, 246 La. 150, 164 So.2d 280 (1964); Faustina Pipe, supra.
The fundamental definition of market value is the price that informed and willing buyers and sellers would reach under usual and ordinary circumstances. Southwestern Electric Power Company v. Conger, 307 So.2d 380 (La.App.2d Cir.1975); Faustina Pipe, supra.
The proposed highest and best use must not be fanciful or speculative but must be "reasonably likely to occur in the not too distant future." Faustina Pipe, supra, at p. 21. Evidence of such things as market and use trends, economic development in the area, and specific plans of businesses or individuals, are probative evidence of reasonably likely future uses of the property.
This court has said
Some factors to be considered in determining highest and best use are: proximity to areas already developed in a manner compatible with the intended use; action already taken to develop land for that use; scarcity of land available for that use; use permitted by zoning ordinances; use to which the property is being put at the time of taking; existence of offers to buy property by those wanting to develop residential property or by those wanting to buy residences; and residential market in the vicinity. Town of Rayville v. Thomason, 404 So.2d 1290, 1293 (La.App.2d Cir.1981).
When these factors are applied to Hart's Bluff, we conclude that the trial court did not err in its determination of highest and best use. Property in the immediate area is already being used for intake sites. C.R. Scurlock testified that he had taken the property off the residential market in anticipation of an increase in value.
We must also disagree with the landowners' contention that the SWEPCO appraisals should be entirely disregarded because they were based primarily on residential comparables. See and compare Henry, supra.
Although SWEPCO appraisers concluded that highest and best use was residential/recreational, Landon and Williams considered the five water intake site comparables in their highest and best use analysis. Two of the five sites were transactions between the landowners and the City of Mansfield and the International Paper Company sites at Hart's Bluff. The other three sites are described:
1. In 1975, the Town of Many bought a lakefront intake site about 18 miles south of Hart's Bluff along an arm or slough of the lake for $3,500 ($34 per water front foot.)
2. In 1979, Sabine River Authority leased a site to Ebarb Water Works for *79 40 years. No consideration was mentioned in the appraisal. The site is about 12 miles south of Hart's Bluff and is not on the river channel
3. In 1983, the River Authority leased 900 square feet to Pendleton Water Association for 10 years in consideration for free water provided to a tourist information center. The site is about 20 miles south of Hart's Bluff.
A topographical map of the reservoir in the record shows four other intake sites along the Louisiana side of the lake. The Logansport municipal water intake is about six miles north of Hart's Bluff. There was also testimony that Dow Chemical obtained a larger intake site in 1982 for $4,187 per acre.
Considering these transactions, SWEPCO appraisers testified that the evidence of market value for a water intake site was sparse and consisted of acquisitions relatively distant from Hart's Bluff. They also said the wide variations in the ages of the transactions and the prices paid also made it difficult to judge the market value of an intake site. They emphasized that, based on their evaluations of all intake transactions, including those involving appellant's other Hart's Bluff properties, the property was worth the same or less either as a water intake site or as a residential site. This testimony shows that the intake site comparables were deliberately considered by the appraisers and by the trial court, who heard these considerations, as probative evidence of market value and highest and best use. Sistrunk's report stated:
The value of land used for intake sites, based on actual land sales researched, indicate no difference in value than recreational sites. The Ebarb Water Works leased land for its site from the DOTD of Louisiana at no charge. The Pendleton Water Works is charged nothing for its site except to provide water for a Tourist Bureau building located adjacent to the site. The City of Many paid $3,500 for its site in 1975. A 1982 purchase of 45.094 acres on the Sabine River by the Dow Chemical Corporation (Cob 512/240, DeSoto Parish) indicates $4,187 per acre for land with about 1,400' on the river channel. (emphasis ours.)
Highest and best use is merely a starting point from which the appraiser begins to compile evidence of transactions he believes are similar to the property he appraises. Wide variations in these appraisals are caused by differing opinions on highest and best use. The responsibility to resolve these variations lies solely within the informed discretion of the trier of fact.
Weaknesses in Dupree's appraisal affects its probative value but does not render it wholly unsound, illogical, and improper for consideration by the trier of fact.
All SWEPCO appraisers discounted or rejected as unreliable Dupree's three comparables. The Mansfield transaction, they opined, was too dissimilar to the subject because the lakefront property was leased, not sold. The mayor of Mansfield testified that the city was rationing water at the time of its purchase and was pressed to complete the project within a short time in order to receive government aid. That transaction, the appraisers concluded, was not under "usual and ordinary circumstances." Even Dupree, however, "downplayed" the value of that comparable.
SWEPCO appraisers also dismissed the sales from appellants and their neighbor to International Paper because they believed the price paid was far in excess of market value. Calling these "isolated transactions" they opined that the intake and pipeline were such a small part of the overall pulpwood plant cost that International Paper paid whatever the landowners demanded to avoid delaying the project. SWEPCO's appraisers did not consider the "value" of International Paper's agreement with the landowners to build the road leading to Martha Street because the company was primarily using the road for access to its own intake site.
Dupree omitted consideration of the Ebarb, Pendleton, and Many intake sites discussed in Landon's and Sistrunk's highest and best use analysis. The reliability of these transactions as comparables may *80 be diminished by their age and distance from Hart's Bluff, but, as Dupree himself testified, every available similar transaction should be scrutinized in light of the scarcity of intake site data.
Rather than either rejecting Dupree's comparables or accepting SWEPCO's appraisals in whole, the trial court apparently diminished the weight of Dupree's appraisal to compensate for weaknesses in his comparables illustrated by SWEPCO's contention that Mansfield and International Paper were "unwilling buyers." This obvious adjustment was within the trial court's fact-finding discretion.
The value placed on the servitudes was not an abuse of trial court discretion. Dupree said he "accepted" the 25¢ per square foot fee value placed on the inland tracts by Landon. The difference in the appraisals stems from the percentage that each assigned for the pipeline servitudes on the inland tracts. The trial court's award of $5,950 is identical to Landon's estimate, indicating that the judge noted that Dupree's concurred with Landon's 25¢ per square foot estimate but rejected, as excessive, Dupree's estimate that the servitudes were worth 80 percent of this amount. This finding is not clearly erroneous and is within the trial court's discretion.
Enhancement of value because of the taking may not be considered in determining just compensation, but any factors, evidence, or characteristics that make the property exceptionally adaptable for the purpose for which it is taken are "admissible as an aid in determining the value" of the property taken. Mid-Louisiana Gas Company v. Sanchez, 280 So.2d 406, 412 (La.App. 4th Cir.1973); Trunkline Gas Co. v. Rawls, 394 So.2d 1250 (La.App.2d Cir. 1980).
The landowners contend that Hart's Bluff is exceptionally adaptable for large volume water intake because the depth of the river channel assures an adequate water supply under all conceivable conditions. The landowners assert that the International Paper comparables are especially probative and controlling because Hart's Bluff is a "limited market property," one that Dupree describes has having relatively few potential buyers and few available suitable sites.
SWEPCO engineers testified that the Sabine River Authority is authorized to draw down the reservoir by 10 feet to serve hydroelectric power plants. This requires industrial water users such as SWEPCO to place their water intakes at least 10 feet below normal pool level. SWEPCO engineers asserted that many other locations on the lake also provide the required 10-foot "drawdown" protection or depth which were considered for an intake site by SWEPCO. The Hart's Bluff site was chosen, they say, because of its proximity to the Dolet Hills plant and to the International Paper pipeline right-of-way which was available to SWEPCO.
The landowners argue that the Hart's Bluff location makes the site exceptionally adaptable because it afforded SWEPCO large cost savings in that
1. 6½ miles of the SWEPCO line could be built on the International Paper pipeline right-of-way, reducint costs;
2. Any other location would require SWEPCO to build a longer pipeline at $50 per foot, and
3. There were no buildings on the site that would have to be purchased and demolished or removed.
These cost factors relate to SWEPCO's business decision to locate the intake, a small but essential portion of the power plant project. This site is simply the closest site, but it is not the only such site which might have been selected by SWEPCO. These factors do not compel us to find error by the trial court. Exceptional adaptability is simply one factor which is used as an aid to reach market value or just compensation. Mid-Louisiana Gas Company; Trunkline Gas Co., supra.
The fact that the trial court award is higher than SWEPCO's appraisals indicates that the trial court considered the property's unique topography and location to support, *81 but only in part, Dupree's comparables. While other intake sites were available and feasible, Hart's Bluff, from a business standpoint, was the best choice.

DECREE
We correct the clerical error (amending $1,870 to $1,817) in the judgment and AFFIRM. Costs of the appeal are assessed one-half to the Scurlocks and one-half to SWEPCO.
AMENDED AND AFFIRMED.