| JETERS, Judge.
These consolidated cases involve the expropriation by the Natchitoches Parish Port Commission (Port Commission) of 260.398 acres of land located in Natchi-toches Parish, Louisiana, and belonging to DeBlieux & Kelly, Inc.; Patricia G. De-Blieux; Tonia D. DeBlieux; and Joseph P. Kelley, Sr. (sometimes hereafter collectively referred to as the “Landowners”). After a ten-day trial extending from June 1, 1998, to July 13, 1998, the trial court rendered judgment in favor of the Landowners, awarding them $1,693,000.00 in compensation for the expropriated property less credits of $178,931.00 and $45,011.35, the credits representing prior deposits in the registry of the court by the Port Commission. The judgment further awarded the Landowners legal interest on the difference between the amount awarded and the prior deposits, with the interest to run from June 18, 1998, until paid, as well as costs of court. At a subsequent hearing held August 25, 1998, the trial court set expert witness fees and certain deposition costs at $98,188.94 and taxed those fees and costs as costs of court. Additionally, at the August 25 hearing, the trial court rendered judgment in favor of the Landowners, awarding them attorney fees totaling twenty-five percent of $1,469,420.65 plus accrued interest, representing the net judgment awarded to the Landowners. The trial court signed a written judgment representing the initial award on July 20, 1998, and signed an additional judgment representing the award of court costs and attorney fees on August 28, 1998. The Port Commission timely appealed these judgments.
While the Port Commission raised a number of assignments of error in its appeal, the principal issue to be decided in this case is the amount of compensation due the Landowners as a result of the expropriation of their property by the Port Commission. Basically, the Port Commission questions the trial court’s classification ^concerning the property’s highest and best use as well as the fair market value awarded based on that classification.
The property at issue actually consists of three separate tracts, but, for the purposes of the litigation, the tracts have been treated as one. All three tracts originate from a 374.02-acre tract found in irregular Sections 41, 42, 43, 46, 47, 80, 81, and 88 of Township 10 North, Range 7 West, Natch-itoches Parish, Louisiana, and are physically located immediately north of the bridge over the Red River at Grand Ecore. Patricia DeBlieux and Tonia DeBlieux owned three and one-half acres as one tract and Joseph P. Kelley, Sr., owned three and one-half acres as another tract. DeBlieux & Kelley, Inc., a family-owned Natchitoches Parish corporation comprised of the heirs of Jeff D. DeBlieux, Sr., and Lucille DeBlieux Kelley, owned the remaining 253.398 acres as the third tract.
HISTORICAL BACKGROUND
This litigation arose as a result of various state and federal programs extending over forty years and having as their goal making the Red River navigable as it traverses the midsection of the State of Louisiana. The trial record contains numerous state and federal feasibility studies and development plans documenting these ef *397 forts. All the efforts in that regard resulted in the river’s navigability in late 1994.
The navigability concept actually had its inception in discussions between representatives of Oklahoma, Texas, Arkansas, and Louisiana as early as 1925. However, specific efforts to make the concept a reality did not begin until 1959, when the United States Corps of Engineers (Corps of Engineers) began a feasibility study of the river’s potential as a navigable river. In 1966, the Corps of Engineers completed a comprehensive study identified as the Red River Basin Study. The ^findings in this study, as well as other influences, prompted the United States Congress, in 1968, to appropriate funds for the Red River Navigation Project (Project). This appropriation provided the necessary capital to convert the study into a viable project. Work began in 1973 to make the river navigable from Shreveport, Louisiana, to its confluence with the Mississippi River north of Baton Rouge, Louisiana. The Project envisioned a series of five locks and dams on the river, creating five pools for navigation stability. Additionally, the Project called for straightening or realigning the river channel, thereby reducing the distance along the river within the Project’s boundary by approximately fifty miles. Construction on the first lock and dam began in 1977, and work on the channel realignments and the last lock and dam reached completion in late 1994. In December 1994, the pool stages of the various pools created by the locks and dams were stabilized at ninety-five mean sea level, and the river was pronounced navigable.
The State of Louisiana also took an active part in the navigability project. By Acts 1965, No. 17, it created the Red River Waterway District (District), consisting of the parishes that the Red River traverses as it meanders through the state. See La.R.S. 34:2301, et seq. The newly created District had as its purpose the establishment, operation, and maintenance of “a navigable waterway system to be known as the Red River Waterway ... extending
from the vicinity of the confluence of Red River with Old River and the Atchafalaya River northwestward in the Red River Valley to the state boundary.” La.R.S. 34:2302. The legislation creating the District provided that, it could achieve its purpose “individually or in cooperation with the federal government, the state and its various agencies, subdivisions and public bodies.” Id. To that end, the District was to be governed by the Red River Waterway | Commission, domiciled in Natchitoches Parish. Id.; La.R.S. 34:2305.
By Acts 1989, No. 586, the Louisiana Legislature created the Red River Development Council (Council). See La.R.S. 51:2401, et seq. The Council’s mandate involved the development of “a master plan for the utilization of the water supply of the Red River for purposes related to the development of the area within the watershed limits of the Red River and its tributaries.” La.R.S. 51:2403(A). The master plan was to address “but not be limited to proposals and recommendations for: agricultural and forestry development; aquacultural and aquabiological development; industrial and commercial development; community development, and such other development as the council shall determine should be included in the plan.” La.R.S. 51:2404(A).
In the midst of this federal and state activity, by Acts 1975, No. 40, the Louisiana Legislature created the Port Commission, a political subdivision of the state domiciled in Natchitoches Parish and governed by a five-person appointed Board of Commissioners (Board). See La.R.S. 34:3151, et seq. The legislation gave the Port Commission authority to exercise its powers within the Parish of Natchitoches. Those powers included doing anything necessary to establish, operate, and maintain a public port. See La.R.S. 34:3153. By Acts 1990, No. 401, § 1, the legislature amended La.R.S. 34:3156 to expand the Port Commission’s general authority to specifically include “the development of industrial parks.”
*398 ACTIONS OF THE PORT COMMISSION IN SELECTING A SITE FOR THE NATCHITOCHES PARISH PORT
■ After its creation, the Port Commission began taking steps to establish and develop a port for the Natchitoches Parish area. The Red River traverses Natchitoches Parish between Lock and Dam Number 3 near Colfax, Grant Parish, | sLouisiana, and Lock and Dam Number 4 near Coushatta, Red River Parish, Louisiana, and the stable pool stage created by these structures seemed to be a logical place to establish a port. The Port Commission authorized studies in 1981, 1982, 1988, and 1990, all for the purpose of addressing the feasibility of a port facility within Natchitoches Parish.
Based on the information made available to it in the earlier reports, the Port Commission initially selected a site on the river a few miles north of the Landowners’ property. On October 17, 1989, the Port Commission entered into an option contract with C.W. Lane Company, Inc. (C. W.Lane), a Caddo Parish corporation and the owner of the land selected for the port site. In the contract, C.W. Lane granted the Port Commission a ninety-day option to purchase 100 acres along the river for $450,000.00, or $4,500.00 per acre. However, this proposed site ultimately proved unsatisfactory because of hydraulic problems giving rise to the development of a large “scour hole.” At its meeting on January 7, 1992, the Board abandoned the C.W. Lane location as a possible site and began pursuing a new site located below the Red River Bridge at Grand Ecore. However, this new site proved unsatisfactory as well, and the Port Commission quickly abandoned the plans to develop the property. Other potential sites proved unsatisfactory for various reasons, and, in mid-1992, the Port Commission’s only site of interest became the subject property.
In a letter dated June 2, 1992, Larry A. LeBlanc, the Port Commission’s engineer, advised David B. “Ben” Carson, the Port Commission’s Chairman, that the Landowner’s property had “numerous characteristics which [made] it an acceptable location for a Port Facility.” These positive characteristics were nine in number and were identified as (1) a slack-water harbor, (2) a deep and wide harbor, (3) ample | (¡protected space for barge fleeting, (4) excellent access to highways, (5) close to a metropolitan area, (6) .sufficient land for future development adjacent to the site, (7) natural ground above the flood plain, (8) no conflicting land uses, and (9) access to a railroad. While LeBlanc found no problems “that would make the site infeasible,” he did.point out that two potential problems should be considered by the Port Commission for budgetary purposes, i.e., the cost of addressing (1) a natural siltation problem and (2) the river bank stability.
The Landowners’ property developed a slack-water harbor because of a realignment by the Corps of Engineers of the section of the Red River north of the bridge at Grand Ecore to improve the river’s navigational characteristics. The realignment resulted in an abandoned bend in the river adjacent to the Landowners’ property, which became a natural harbor protected from river traffic and with little or no current flow — a slack-water harbor.
Sometime in 1992, the Port Commission retained Jack Farmer, a Natchitoches Parish land surveyor, to perform an initial analysis of part of the Landowners’ property. Farmer’s first activity entailed only the taking of cross sections of the river to determine the elevations of its bed. Farmer eventually prepared and submitted a preliminary survey of the property. That preliminary survey, dated August 2, 1994, described the property as 203 acres, rather than the 260.398 acres the Port Commission ultimately expropriated. Although the preliminary survey purported to be an accurate survey of the property ultimately expropriated, it contained an error in that it failed to “close” properly. *399 This error resulted in an incorrect calculation of the acreage contained within its boundary. The initial appraisals of the property obtained by the Port Commission and its initial deposit of $178,931.00 in the registry |7of the court were based on the erroneous assumption that the property contained 203 acres. Later discovery of the error resulted in a $45,011.35 supplemental deposit.
At its February 1, 1994 board meeting, the Port Commission retained the services of Randy S. LaCaze, a Natchitoches Parish realtor, to “look up and down the river at other locations to see what kind of prices are paid for land” and “to prepare some overviews of the [Landowners’ property], look at 100 acres by high water , lines as well as by low water lines and compare.” In April of that year, the Board retained LaCaze and James A. Young, a Shreveport, Louisiana realtor, to appraise the property.
LaCaze provided the Port Commission with a written preliminary analysis on August 12, 1994. Using the erroneous acreage amount of the Farmer preliminary survey, he established the fair market value of the property as $178,931.00. Also relying on the Farmer survey, Young submitted a •written report dated August 15, 1994, wherein he established the fair market value of the property as $242,500.00. After receiving these appraisal reports, the Port Commission retained the services of a third appraiser, John Barry Guillet, a Natchitoches Parish realtor. Guillet, with one week’s notice, submitted a written report to the Port Commission on September 28, 1994. He divided the property into three separate tracts, valuing each three and one-half acre tract at $4,375.00 and valuing the remaining property (which he concluded was 202 acres) at $106,100.00.
On or about October 1, 1994, the Port Commission offered to purchase from the Landowners what it thought was 203 acres for $178,931.00, the amount of the LaCaze appraisal. When the Landowners failed to respond to the offer by the Board’s October 5 meeting, the Port Commission considered the offer rejected. The minutes |sof that meeting reflect what the Port Commission then considered its choices to be based on its assumption that its offer had been rejected:
As a result the Commission considered two options, 1) abandon the port project; and 2) expropriate the property.... Mr. deVargas noted that the landowners had previously informed the Commission that they wanted to sell the property, had told the Commission he [sic] was anxiously awaiting an offer for the land and wanted to work with the Commission but now refused a substantial offer. Consequently, expropriation is the only other recourse available.
Although authorized in the October 5 board meeting, the Port Commission did not file expropriation proceedings immediately. Instead, negotiations continued, with the Landowners countering with an offer of their own. Suggesting that the Port Commission was attempting to expropriate more property than necessary, the Landowners offered to sell it 100 acres for $750,000.00, or $7,500.00 per acre. At its November 1, 1994 meeting, the Board rejected this counteroffer.
On November 7, 1994, the Port Commission instituted three separate suits to expropriate the property by the quick-taking process authorized by La.R.S. 48:441, et seq. Contemporaneously with the suits, the Port Commission deposited in the registry of the court $7,000.00 as just compensation for the property belonging to Patricia G. DeBlieux and Tonia D. DeBlieux; $7,000.00 as just compensation for Joseph P. Kelley, Sr.; and $164,931.00 as just compensation for DeBlieux & Kelley, Inc. The trial court then issued orders of expropriation in each suit, declaring title to the three tracts to be vested in the Port Commission as of November 7,1994.
ACTIONS OF THE LANDOWNERS IN RESPONSE TO THE PORT COMMISSION’S EFFORTS TO EXPROPRIATE THE PROPERTY
It is unclear from the record exactly when the Port Commission approached the *400 Landowners concerning purchasing their land, although it is evident that negotiations [9did not commence until sometime after mid-1992. It is clear, however, that the initial discussions centered around the purchase of only 100 acres, and not the 260.398 acres ultimately expropriated. In fact, as late as the January and February 1994 board meetings, the Port Commission still contemplated purchasing only 100 acres. At the February board meeting, it was announced that the Red River Waterway Commission had provided the Port Commission with a $750,000.00 grant for the acquisition of land and facilities and that on January 17, Carson and the Board’s attorney had met with the officers of DeBlieux & Kelley, Inc., concerning the purchase of 100 acres. This reference to the corporation constitutes the first official mention of any discussions concerning even a part of the subject property.
As discussions between the Port Commission and the Landowners continued, the Landowners attempted to reassess the potential of their property. By correspondence dated May 23, 1994, Jeff D. De-Blieux, Jr., president of DeBlieux & Kelley, Inc., advised the Natchitoches Parish Planning Commission (Planning Commission) of the corporation’s plans to develop the property at issue for the following purposes: (1) for mooring and barge fleeting, (2) as a docking and loading facility, (3) for gravel and sand storage and handling, (4) for gambling boat docking, (5) as a fueling facility for boats, (6) as a grain elevator, and (7) as an oil loading facility. The letter requested that the Planning Commission forward an application for changing the zoning classification of the property if such activities were forbidden under the existing zoning classification.
Ms. Juanita Fowler, the planning director of the Planning Commission, responded to the corporation’s request by correspondence dated May 31, 1994, in which she notified DeBlieux that the property’s then zoning classification was Imindustry and agriculture and that some of the activities proposed in the May 23 correspondence would require a reclassification to heavy industry. Ms. Fowler enclosed the appropriate application forms necessary to change the classification and advised DeBlieux of the Planning Commission’s monthly meeting schedule.
Robert B. DeBlieux then completed the reclassification application on behalf of the corporation and submitted it to the Planning Commission on June 7, 1994. At the August 2, 1994 Planning Commission hearing, he appeared and informed the Planning Commission that the action was necessary because of “the kind of traffic associated with the development along the river” and because the “land south of the Grand Ecore bridge had already been leased to the Louisiana Towing Co., and that land west of the bridge would be reserved for development by the Natchi-toches Port Commission.” The application was then tabled for sixty days to give the corporation an opportunity to submit “a master plan for industrial development” of the property.
The Planning Commission placed the corporation’s application on the agenda of its October 4, 1994 meeting. The Port Commission’s attorney appeared at the meeting and informed the Planning Commission that the Port Commission had authorized an action to expropriate approximately 200 acres of the property subject to the rezoning request. He requested that the Planning Commission postpone any action on the corporation’s request, pending the development by the Port Commission of its own master plan for the development of a “port area”on the property. The attorney also submitted a written request to that effect. Despite requests to the Planning Commission by both Robert and Jeff DeBlieux to act on the corporation’s application, it acquiesced in the Port Commission’s request and tabled the application indefinitely.
__LuThe Landowners initially responded to the expropriation petitions by timely filing in each suit motions to dismiss. These *401 motions asserted that, at the time the expropriation proceedings were filed, the Port Commission “[had] no definitive plan for the development of any portion of [the] property.” Specifically, the Landowners asserted that plans for the development of the northwest 119 acres of the property were “so tentative and subject to change as to constitute speculation by-the Port Commission.” After completing a number of discovery depositions wherein members of the Port Commission testified under oath that all of the property was necessary and that plans did exist for industrial development, the Landowners dismissed their motions.
After the Port Commission instituted suit, the Landowners retained the services of Oren W. Russell, a real estate broker from Baton Rouge, Louisiana, to appraise the property. Russell concluded that the high land of the property, consisting of 107.418 acres according to the corrected survey, had a fair market value of $13,628.00 per acre, or a total of $1,463,-893.00. The remaining low land, consisting of 152.98 acres, had a value of $1,500.00 per acre, or a total of $299,-470.00. Thus, Russell appraised the total value of the property as $1,693,363.00.
PORT COMMISSION INVOLVEMENT IN OTHER INDUSTRIAL DEVELOPMENT ALONG THE RED RIVER
Even before it acquired the expanded authority to develop industrial parks as well as a port facility, the Port Commission became involved in other industry-seeking efforts along the Red River. At the same time it entered into the option to purchase the C.W. Lane property, the Port Commission also entered into a separate option agreement with Nemesis Chemical International, Inc. (Nemesis Chemical), a Texas corporation, wherein it granted the chemical company the exclusive option to hapurchase ten acres of the land subject to the C.W. Lane option in the event the Port Commission decided to exercise the option. The Port Commission quoted a purchase price of $75,000.00, or $7,500.00 per acre, to Nemesis Chemical.
Part of the Port Commission’s industrial inducement activity arose in conjunction with the Port Commission’s developing relationship with Central Louisiana Electric Company, Inc. (CLECO), an electrical supplier having a vested interest in the industrial development of the Red River. In 1990, CLECO had involved itself in attempting to locate Central Louisiana sites for a paper manufacturing plant and an international industrial company referred as a Tioxide Plant.
By correspondence dated March 10, 1993, the Port Commission, through its attorney, informed Brady Boudin, an economic development specialist with CLE-CO, that the Port Commission had already selected a port site in a slack-water" area immediately north of the Louisiana highway bridge over the Red River and that it was “committed to the premise that there be an .Industrial Park developed in conjunction with the Port.” The site referred to was the Landowners’ property. The correspondence further stated:
The Port and the Industrial Park will both be in the vicinity that CLECO sponsored for the proposed Tioxide plant, and CLECO is fully aware of the industrial amenities offered by this general area, such as: [i] proximity to the navigable Red River and the proposed Port; [ii] elevation at or above the 100-year flood plain; [iii] protection from both river and back-water flooding; [iv] proximity to several major state and federal highways; [v] nearness to two [competing] natural gas transmission pipelines; [vi] access to fresh water sources in the Black-Clear-Saline Lake complex; and [vii] three [competing] electrical utilities serving the general area.
| ^property immediately adjacent In the letter, the attorney informed Boud-in that the Port Commission had recently acquired knowledge that a 390-acre tract of land known as the “Nelken/Pressburg” to the *402 port property was soon to be for sale for $250,000.00, which, in the opinion of the Port Commission, was “no more than $100 per acre above minimum, agricultural land values in the area.” He went on to say:
This tract can have either of two equally viable industrial uses: [i] as the Industrial Park area for the Port, or [ii] as the core plant site for Tioxide or a similar major industrial plant [in which case the Industrial Park area could simply be shifted next-door to the adjoining De-Blieux tract]. Basically, we think it is a golden opportunity to pick up a very fine industrial tract, at farm-land prices.
The attorney then suggested that CLECO form a “shell” corporation and purchase the 390 acres. If CLECO did purchase the property, according to the attorney, the Port Commission would, as soon as possible, then purchase the tract from CLECO as its industrial park site.
Additionally, at its April 1-993 board meeting, it was announced that Pine Bluff Sand & Gravel Company and Lott Oil Company had expressed an interest in locating on the proposed industrial site. The names of both of these companies continued to be mentioned at a number of the monthly meetings over the next eighteen months before the inception of the expropriation proceedings.
OTHER INDUSTRIAL INTEREST IN THE LANDOWNERS’ PROPERTY
As early as 1989 or 1990, other interest was being shown in the Landowners’ property for industrial development. Robert DeBlieux testified that, in 1989 or 1990, he hosted a meeting at his home at the request of Guillet wherein Guillet brought a representative of a Washington, D. C., company interested in an industrial site in the area. Additionally, a report prepared by CLECO for the Louisiana Office of Commerce and Industry in conjunction with its efforts to entice a paper manufacturing plant to the area listed the Landowners’ property as one of the | urecommended locations within the Sabine, Natchitoches, and Rapides Parish areas. CLECO also listed a small part of the property belonging to the corporation (49.13 acres) in a July 1990 report to a Virginia engineering firm as being a part of a package of over 1,000 acres available for industrial development along the Red River in Natchitoches Parish.
LEGAL ANALYSIS
The Louisiana Constitution grants the state and its political subdivisions the power to expropriate privately owned property “for public purposes and with just compensation paid to the owner.” La. Const, art. I, § 4. The owner is entitled to “be compensated to the full extent of his loss.” Id. The general method of expropriation is found in La.R.S. 19:1, et seq. Under this general procedure, the expropriating public body acquires ownership of the property only after final judgment. La.R.S. 19:8. However, when the Louisiana Legislature amended La.R.S. 34:3156 by Acts 1990, No. 401, § 1, to grant the Port Commission authority to develop industrial parks, it also granted the Port Commission authority to use the quick-taking expropriation procedure available to the Louisiana Department of Transportation and Development (DOTD) wherein DOTD may acquire title to property expropriated for highway purposes prior to obtaining a judgment by depositing its estimation of just compensation in the registry of the court. See La.R.S. 48:441, et seq. Pursuant to this expropriation process, title is vested in the expropriating public body at the time it deposits its estimate of just and adequate compensation for the property owners. La.R.S. 48:445. Thus, title to the Landowners’ property became vested in the Port Commission on November 7, 1994, the date of the initial deposit in the registry of the court. Additionally, because the Port Commission has the authority to use the quick-|taking1B expropriation available to DOTD, the jurisprudence in *403 terpreting that process is applicable herein.
Calculation of the amount of damages due to a landowner whose property is expropriated for public purposes “depends on the highest and best use of the property.” Louisiana Resources Co. v. Noel, 499 So.2d 1016, 1018 (La.App. 3 Cir.1986). Further,
Highest and best use is the most favorable employment to which the property is adaptable and may reasonably be put in the not too distant future. If potential future use of the property is shown to be within the reasonably near future, then the landowners are entitled to compensation on the basis of such use even though the property is not being so utilized at the time of taking. Market demand is an important factor in determining potential use. Other important factors include economic development in the area, specific plans of businesses and individuals, including action already taken to develop the land for that use, and the use to which the property is being put at the time of the taking.
Id. at 1019 (citations omitted).
However,
Merely offering evidence that property could be converted to another use is insufficient to establish potential future use necessary to entitle a landowner to compensation. The landowner must show that the property may reasonably be put to that use in the not too distant future by offering evidence as to the market demand for that use, as to specific plans of individuals to develop the land for that use, and as to the difficulty and economic feasibility in converting the land to another use.
State, Dep’t of Transp. & Dev. v. Boagni, 509 So.2d 471, 474 (La.App. 3 Cir.1987). The burden of proof lies with the landowner to establish by a preponderance of the evidence that the amount deposited in the registry of the court is insufficient to constitute just compensation for the expropriated property. West Jefferson Levee Dist. v. Coast Quality Constr. Corp., 93-1718 (La.5/23/94); 640 So.2d 1258, cert. denied 513 U.S. 1083, 115 S.Ct. 736, 130 L.Ed.2d 639 (1995); State, Dep’t of Transp. & Dev. v. Dietrich, 555 So.2d 1355 (La.1990).
Further, La.R.S. 48:453(A) provides the measure of the compensation due the landowner of expropriated 'property subject to the quick-taking process, as follows:
The measure of compensation for the property expropriated is determined as of the time the estimated compensation was deposited into the registry of the court, without considering any change in value caused by the proposed improvement for which the property is taken.
With these precepts in mind, we turn to the evaluation of the Port Commission’s assignments of error.
OPINION
■ In rendering its decision, the trial court faced an extensive record consisting of expert and lay witness testimony and over 240 exhibits. Many of the exhibits are lengthy comprehensive studies of the overall navigation project as well as the port itself. Because of conflicting schedules, the trial itself did not run continuously to its conclusion but was interrupted three times, with one of the interruptions lasting over a month.
Those accepted as experts by the trial court included experts in the fields of real estate appraisal, industrial brokering, engineering, environmental regulation, river sedimentation, geotechnical engineering, wetland evaluation, general appraisal practices and procedures, and industrial real estate appraisal methodology and procedure. Despite access to all this expertise on such varied subjects, the trial court had only four appraisals to consider. The three prepared on behalf of the Port Commission ranged from $114,850.00 to $242,500.00 (before adjustments for the inaccurate survey), while the one presented by the Landowners totaled $1,693,000.00. The total amount ultimately tendered by *404 the Port Commission ($223,942.35) is substantially less than the Landowners’ valuation. Finding the Landowners’ expert |17provided the appropriate fair market value of the property expropriated, it adopted that valuation as its own and rendered judgment accordingly.
All four experts who valued the property are eminently qualified as real estate appraisers. LaCaze and Guillet. are both residents of the City of Natchitoches and have performed hundreds and even thousands of appraisals within the Natchitoch-es Parish area. LaCaze, who is also the chairman of the Planning Commission, began his practice in 1982. Guillet received his license from the state in 1966. Both have appraised properties along the Red River, and Guillet worked for the Red River Waterway Commission, negotiating property acquisitions for its realignment purposes.
Young’s real estate career began in 1974, and he has appraised “more than five hundred” tracts along the Red River, with much of his work in that regard being for the Red River Waterway Commission. As was the case with Guillet, Young’s principal activity for that body related to its realignment projects. Although Young is from Shreveport, he has appraised 100 to 200 tracts of land within Natchitoches Parish. Young’s employment history included appraisals for individuals, government agencies, and private industry. When working with the Caddo-Bossier Port Commission, he appraised more than fifty percent of that body’s acquisitions.
Russell began in the real estate business in 1960 and works primarily with commercial, industrial, and agricultural property. He resides in Baton Rouge, Louisiana, and has been extensively involved with industrial property along the Mississippi River. In that regard, his experience includes appraisal work with some 200 to 300 properties along the Mississippi River involving some of the more nationally and internationally recognizable names in industry. One of his clients is Lathe Corps of Engineers. However, unlike the Port Commission’s three appraisers, he has little experience in appraising property along the Red River.
Other expert witnesses recognized by the court include Michael J. Falgoust, an expert in the field of industrial brokering; Claude Edwin Fike, IV, an expert in the field of environmental regulations, permitting, planning and mitigation; Dr. John Wesley Glascock, an expert in real estate evaluation; Jefferson Davis DeBlieux, IV, an expert in the field of civil engineering technology, surveying, and right-of-way permitting; Dr. Charles E. Adams, Jr., an expert in the field of river sedimentation; James M. Aronstein, Jr., an expert in the field of geotechnical engineering; Charles William Hair, III, an expert in the field of geotechnical engineering with a subspe-cialty in potomology; Raymond Thomas Sankey, an expert in the field of wetland evaluation, permitting, and mitigation planning; Harry Seidman, an expert in the field of appraisal practices and procedures; Dr. Jay Jayawardana, an expert in the field of port and marine economics, planning transportation operations, and funding; and Dr. William N. Kinnard, an expert in the field of industrial real estate appraisal, appraisal methodology, and appraisal procedure and technique. None of these witnesses expressed an opinion about the property’s fair market value but testified concerning the methodology used by Russell in his appraisal or concerning factors which should or should not have been used to adjust his final calculation.
We first note that expert witness testimony is not conclusive and that the opinions expressed by experts are generally regarded as advisory in nature. As such, they are not binding on the trier of fact. State, Dep’t of Highways v. McPherson, 261 La. 116, 259 So.2d 33 (1972). Additionally, when considering the testimony of appraisers, the trial court is entitled to consider “the professional qualifications and experience of the |iaexpert, the facts and studies upon which his opinion is *405 based and, in the case of land appraisals, his familiarity -with the locality.” Id. at 39.
The reviewing court applies a manifest error standard of review to factual matters determined by the trial court, including the testimony of experts:
It is well settled that a court of appeal’ may not set aside a finding of fact by a trial court or a jury in the absence of “manifest error” or unless it is “clearly wrong,” and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be. disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.
When findings are based on determinations regarding the credibility of witnesses, the manifest error — clearly wrong standard demands great deference to the trier of fact’s findings; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said.
The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound.
Lirette v. State Farm Ins. Co., 563 So.2d 850, 852-53 (La.1990) (citations omitted) (emphasis added).
The Port Commission argues that Russell is not qualified to formulate an opinion on the use and value of Natchitoches Parish property; that his valuation is based on the faulty premises that the property’s highest and best use is industrial; and that his opinion is unsound due to the methodology used in its formulation. Thus, the Port Commission argues that the trial court considered no evidence in determining the property’s highest and best use other than the fact that the Port Commission had expropriated this property as a port location. We disagree with this narrow view of the evidence and find that industrial development of the Red River had been the topic of discussion for a number of years before the expropriation proceedings. In fact, based on the record before us, no entity public or private had documented the river’s industrial potential more than the Port Commission itself.
1 spit would be- an impossible task to summarize all the evidence presented in this extensive record reflecting examples of the industrial potential of the Red River. In fact, a primary purpose of the navigability project was to create industrial possibilities for the surrounding property. We have already mentioned a number of examples of industrial potential, but a particularly telling example is the March 1993 attempt by the Port Commission to entice CLECO into forming .a shell corporation and quietly purchasing the “Nelken/Press-burg” property adjacent to the Port .Commission’s proposed port and industrial park site. Another part of that correspondence not already quoted reads as follows:
We see many important and immediate benefits arising from this transaction. First, handled in the above fashion, land values in the area will he fixed ■ [or capped] for future acquisitions of the Port site, etc. Second, once the property is transferred to the Commission, sources of additional financing will be opened, such as grants from the Red River Waterway Commission, etc. Third, this Nelken/Pressburg tract is .one that will ultimately be involved in industrial development, if anything occurs in the vicinity, and it is important to control this property at an early stage. Fourth, there is almost no downside to the Corporation, the Commission or CLECO, since the tract is being purchased at little or no premium over current farm-land prices.
[[Image here]]
If you need any other information, please let us know. In particular, we remind you that the Commission must move quickly on this matter or run the risk of losing this opportunity.... [I]f *406 CLECO is not interested in being involved in this situation, we ask that you let us know so that we can then contact others.
(Emphasis added.)
The ultimate conclusion of the correspondence was that “[bjasieally, we think it is a golden opportunity to pick up a very fine industrial tract at farm-land prices.” (Emphasis added.) In other words, the Port Commission was, in 1993, making a concerted effort to clandestinely control the land prices for its own purposes while acknowledging the prime industrial nature of the riverfront property.
| ¡,.,We also nóte that, when the Port Commission initially retained LaCaze and Young to appraise the Landowners’ property, its emphasis was on the potential of litigation, and not fair market value. The board minutes of April 5, 1994, state that they were retained “since they were by far the best courtroom witnesses in the area especially for Natchitoches courtrooms.” This public comment appears before any specific negotiations had taken place and even before any property values had been established. When Young’s appraisal was submitted, it was obviously too high for Port Commission purposes and remained suppressed for a significant period after the expropriation process began.
The Port Commission’s opposition to the Landowners’ efforts to change the zoning characteristics of the property is another example of its recognition of the industrial status of the property and of its efforts to control the land prices within the area. The Port Commission’s attorney, personally and in writing, informed the Planning Commission on October 4, 1994, that the Port Commission had met on that afternoon and authorized expropriation of the Landowners’ property. The board minutes reflect that the authorization meeting did not occur until the next day. Additionally, at that meeting, the Board was advised that the Landowners had been offered the higher of the LaCaze and Guillet appraisals. No mention was made of the Young appraisal, which was $63,569.00 higher than the LaCaze appraisal (without adjustment for the survey error). The opposition letter submitted to the Planning Commission stated in part the following:
As a result of the Port Commission’s decision to expropriate at least a portion of the land subject to the above-mentioned rezoning request, it respectfully requests that you defer a decision on the DeBlieux & Kelley, Inc. application, at least insofar as it impacts the property to be acquired, to allow the Committee appointed at today’s Port Commission Meeting to develop a Natchitoches Port Master Plan, j^which will include, among other things, a plan for the development of utilities, water supplies and access roads for the port site. Of course, the re-zoning of the DeBlieux & Kelly, Inc. tract which will become a portion of the port site prior to development of the Natchitoches Port Master Plan could have consequences insofar as development of an orderly and well conceived Port and attendant Industrial Park are concerned. Additionally, there is a question as to whether the Planning Commission would have jurisdiction over the port site once expropriated, since the Port Commission would have jurisdiction over the port site once expropriated, since the Port Commission, pursuant to its enabling legislation, is an independent governmental entity. Of course, the Port Commission would nonetheless foresee working closely with the Planning Commission in developing its Natchitoches Port Master Plan.
This letter was approved by the Board at its October 5 meeting, although it had already been submitted to the Planning Commission as being the Port Commission’s position on the rezoning issue. It is interesting to note that on April 15, 1996, the Port Commission applied to the Planning Commission for the same permit it had requested the Planning Commission deny the Landowners. At its regularly scheduled meeting on May 7, 1997, the *407 Planning Commission, by unanimous vote, granted the Port Commission its requested change in zoning status.
The Port Commission argues on the one hand that there is no potential for industrial development on the Red River, yet on the other hand continuously publicly stated that the potential not only existed, but was imminent. At the November 1,1994 board meeting, the discussion evolved around the Landowners’ offer to sell 100 acres at $7,500.00 per acre as well as the Landowners’ complaint that the Port Commission was attempting to expropriate more land than it needed. In response, the Board “noted that the amount of land to be expropriated was the amount determined, after years of planning, negotiations and development, to be necessary to support the infrastructure and generate the commerce necessary to justify building the port.” (Emphasis added.) The minutes further stated:
| ?sThe entire 203 acres to be expropriated will be needed for the infrastructure to support the amount of industry and commerce it is projected the port will attract. There are several reasons why this particular site, as opposed to other sites which were reviewed, was chosen to house the new port site. One of the most important reasons for the selection of the site is that its development will be more economical than any of the other areas surveyed. In particular, power, gas and water lines are readily accessible. From a safety standpoint, this location and layout of the selected site will offer a greater security to the tenants Of the port site. It will enable more control over who has access to the port and keep unwanted visitors and vandals out of the area. Further, the extension of the closure dam on the property would be far more economical than building an entirely new structure.
Mr. LeBlanc noted that this conceptual plan entertains questions very common in development of future lands by ports. Many ports exist in areas that ■ cannot be used for other types of development, so they are put to use as port sites. In the professional opinion of Bernard & Thomas, the 203 acres of land chosen is necessary for the development of the Natchitoches Port since, among other things, a larger area will be ■needed over time to attract industry which will in turn generate funds to support the expenditures made to develop the port. Numerous improvements must be made to the site to make it viable economically. Mr. LeBlanc reiterated that development of a port requires a substantial investment, and includes the construction of, among other things, closures, revetments, bank stabi- . lization structures and docking facilities, together with the dredging required to maintain the port’s channel. It is this kind of infrastructure, however, which is necessary to create a port. In order for the port to economically justify this kind of investment, however, it needs to create enough opportunities to attract sufficient industries and tenants, which in turn requires sufficient available land for present and long range development.
Additionally, the initial deposition testimony of various Port Commission officials taken in association with the Landowners’ motion to dismiss substantiates its long-held position that industry was the future of the area.
We find that the Port Commission’s argument that the highest and best use of the property is agriculture flies in the face of its prior public position and of the numerous Red River studies made a part of the record. As such, we find no manifest error,in the trial court’s acceptance of Russell’s opinion that the highest and best use of the expropriated property is for industrial or, port development. Therefore, we find |?4those assignments of error addressing this issue to be without merit.
The Port Commission also disputes the amount of the compensation awarded in the trial court’s judgment. In *408 the assignments of error addressing this portion of the judgment, the Port Commission again points to Russell’s inexperience in the Natchitoches Parish area, his failure to use Natchitoches Parish comparables in reaching his assessment of the property’s fair market value, his lack of investigation of the property’s economic feasibility, and his failure to make adjustments for the various characteristics of the property. It further asserts that Russell’s opinion is flawed in that he bases his valuation on the fact that the property has been expropriated as a port and that this violates the mandate of La.R.S. 48:453(A), which provides:
The measure of compensation for the property expropriated is determined as of the time the estimated compensation was deposited into the registry of the court, without considering any change in value caused by the proposed improvement for which the property is taken.
(Emphasis added.)
Certainly, the enhanced value created by the taking is not a proper consideration in determining the fair market value of expropriated property. However, any “characteristics that make the property exceptionally adaptable for the purpose for which it is taken are ‘admissible as an aid in determining the value’ of the property taken.” Southwestern Elec. Power Co. v. Scurlock, 485 So.2d 72, 80 (La.App. 2 Cir. 1986) (quoting Mid-Louisiana Gas Co. v. Sanchez, 280 So.2d 406, 412 (La.App. 4 Cir.), writ denied, 282 So.2d 142 (La.1973)).
Russell explained in this testimony that the slack-water port available on the expropriated property did make it uniquely suited for a port location. While acknowledging that he did not use local compara-bles in evaluating the property’s fair | ¿market value, he concluded that, given the nature of the drastic change in the Red River’s usability by becoming navigable, such comparables were useless. In other words, while the agricultural comparables used by LaCaze, Guillet, and Young were historically accurate and would certainly have been appropriate absent the navigability project, the change in the status of the river required that all the property along the river be reevaluated from both a highest and best use standpoint and a fair market value standpoint.
Regarding the other concerns about Russell’s testimony as expressed by the Port Commission, we note that they are similar in scope to those expressed in relation to the fair market value determination by the trial court. Since we have already concluded that the trial court did not commit manifest error in determining that the property’s highest and best use was that of industrial and port development, we are left with only Russell’s appraisal, because the other three appraisers based their calculations on its highest and best use as agricultural property. Therefore, the only issue left is whether Russell used the appropriate methodology and gave due consideration to the various factors affecting the property.
In reaching his final evaluation of the property’s fair market value, Russell performed an investigation of the property values associated with the Alexandria and Caddo-Bossier ports along the Red River and their effect on the industrial development of those areas. As previously stated, he did not consider local comparables helpful because of the river’s change in navigable status. Thus, he considered it more helpful to evaluate the development of other river areas, including the area with which he was most familiar, the Mississippi River. Russell’s methodology and consideration or lack of consideration of other factors affecting 1 ^property values was the subject of days of conflicting expert testimony.
All the experts who testified have impeccable credentials and are highly respected in their areas of expertise. Some are practitioners and others university professors. Some have experience in a limited *409 geographical area, while some are international in scope. Some have done extensive research in their fields, and some have more practical hands-on experience.
Falgoust resides in Baton Rouge but is co-owner of a commercial and industrial real estate firm having offices in Baton Rouge, Alexandria, and Shreveport. He has expertise in marketing industrial sites for his clients. Dr. Glascock was formerly on the faculty of Louisiana State University (LSU) in Baton Rouge but currently is a professor of real estate on the faculty of the University of Connecticut. While at LSU, he chaired the Louisiana Real Estate Commission and served as director of the Louisiana Real Estate Research Institute. Dr. Kinnard is president of Real Estate Counseling Group of Connecticut, a property valuation company. He serves as a consultant on business and industrial real estate matters with a number of business corporations, the names of which are commonly recognizable. Additionally, he previously served on the faculty of the University of Connecticut, has authored a number of books and articles in the real estate field, and has taught seminars on the uniform standards applicable to appraisal practices. DeBlieux is a Houma, Louisiana resident employed by Louisiana Land and Exploration Company. He is responsible for overseeing 650,000 acres of land in south Louisiana regarding all activities affecting the land surface. Part of that overseeing responsibility includes obtaining wetland permits from the Corps of Engineers. These experts evaluated Russell’s work on behalf of the Landowners.
l27Seidman resides in Austin, Texas, and has been in the real estate appraisal and consulting business for twenty-eight years. He holds the designation as Counselor of Real Estate within the industry and has appraised a number of large projects, including the Midwest Stock Exchange in Chicago, Illinois. Dr. Jayawardana is a professor on the faculty at LSU in Baton Rouge. Additionally, he serves as an economist with the National Ports and Waterways Institute at LSU. The LSU institute is one of only three in the nation, with the other two being at Massachusetts Institute of Technology and the University of California at Berkeley. His duties with the Institute involve working with both state and federal agencies concerning how to spend the funds allocated for various port projects. A part of his work involves the Red River. Dr. Adams is a former LSU professor who now performs sedimentation and navigation consulting work for private companies. ' His work carries him to international venues, and he has published approximately forty research papers within his area of expertise. Aron-stein is a principal in a Baton Rouge geo-technical engineering firm dealing with soils and foundations. He developed his experience working on commercial and residential buildings, bridges and highways, and ports and industrial sites. Hair is with the same firm as Aronstein, and has developed a specialty in geotechnical procedures and practices relating to rivers. His subspecialty is that of potomology, which is the broad-base study of rivers incorporating hydrology, sedimentology, geotechnology, soil mechanics and the various aspects of geology associated with the formation, maturation, and eventual demise of rivers. Sankey is an associate with a Newport News, Virginia firm whosé expertise is in water and waste-water projects. He is a professional wetlands scientist and spends eighty-five percent of his time on wetland projects. All of these experts testified on |2Sbehalf of the Port Commission.
It is next to impossible to summarize the testimony of all these highly qualified experts. Each testified within his area of expertise and expressed support or disagreement with Russell’s opinion. The trial court heard all the testimony, determined the credibility of each witness, and reached a finding of fact concerning the fair market value of the property, using Russell’s analysis.
*410 The trial court also had before it the history of the Port Commission’s activities in locating a port site, including particularly its 1989 option agreement with C.W. Lane wherein it agreed to a $4,500.00 per acre price for 100 acres of land. It further had the supplement option before it wherein the Port Commission attempted to negotiate a sale of part of that acreage for $7,500.00 per acre. Russell appraised the property by dividing it between that portion above the high water mark of the river and that portion between the high water mark and the low water mark. He valued the 107.418 acres above the high water mark at $13,628.00 per acre and the remaining 152.98 acres at $1,500.00 per acre. This resulted in an average value of $6,502.98 per acre, or more than the Port Commission had offered C.W. Lane, but almost $1,000.00 less than it would have received had its option with Nemesis Chemical been executed.
Based on our review of the record and applying the manifest error standard of review, we find no manifest error in the trial court’s acceptance of Russell’s opinion in setting the fair market value of the property. Therefore, we find no merit in the Port Commission’s assignments of error addressing this issue.
Finally, the Port Commission complains that the trial court’s awards of attorney fees and expert witness fees are excessive and an abuse of discretion. The trial court | ¡.^awarded attorney fees of twenty-five percent of the increased award and expert witness fees of $97,698.59.
Under La.R.S. 48:453(E), the trial court may award reasonable attorney fees' if the amount of compensation deposited in the court registry is less than the amount of compensation awarded in the judgment. Such attorney fees may not exceed twentyTive percent of the difference between the award and the amount deposited in the court registry. Id. Attorney fees awarded in expropriation cases are within the discretion of the trial court, but appellate courts may evaluate the reasonableness of such awards. State, Dep’t of Transp. & Dev. v. Williamson, 597 So.2d 439 (La.1992). Factors to be considered in determining the reasonableness of the attorney fees include the ultimate result obtained; the responsibility incurred; the importance of the litigation; the amount of money involved; the nature and extent of the work performed; the legal knowledge, attainment, and skill of the attorneys; the number of appearances made; the intricacies of the facts involved; the diligence and skill of the attorney; and the court’s own knowledge. Id.
The Landowners’ attorneys were able to increase the expropriation amount to $1,693,000.00 for a net award of $1,469,-420.65, or a 656% increase over the amount the Port Commission deposited into the court registry. In so doing, the attorneys devoted a significant amount of time to the case, over 1,500 hours, pursuing the matter through a ten-day trial involving numerous lay and expert witnesses and over 240 exhibits. Much responsibility was placed on the attorneys due to the public attention focused on the matter and the amount of land and money involved. Additionally, the issues involved intricate facts and required significant skill on the part of the attorneys. Considering these factors, we do not find an abuse of the trial lancourt’s discretion in the amount of the attorney fee award, which was within the statutory limit.
Additionally, in expropriation proceedings, the condemning authority is to be taxed with the reasonable costs of the landowner’s testifying expert witnesses retained to assist him in obtaining his just compensation. Board of Comm’r of the Tensas Basin Levee Dist. v. Crawford, 98-1605, 98-1606 (La.App. 3 Cir. 4/21/99); 731 So.2d 508, writ denied, 99-1475 (La.9/3/99); 747 So.2d 546. The fixing of such expert witness fees is largely within the discretion of the trial court, and such award will not be disturbed on appeal absent an abuse of that discretion. Id. In *411 setting the expert witness fees, each case must turn on its particular facts and circumstances. Id. However, some of the pertinent factors to be considered are the amount of time consumed by the experts in compiling their reports, the amount charged to the landowner, the amount of time spent in preparing for trial, the amount of time spent in court, the expertise of the expert, the difficulty of the appraisal, the amount of the award, and the degree to which the expert witness’ opinion aided the court in its decision. Id. Again, given the complicated nature of this litigation, the amount of preparation obviously required to prepare for trial, the substance of the testimony presented, the amount of the award to the Landowners, and the degree to which the Landowners’ experts’ opinions aided the trial court, we find no abuse of discretion in setting the expert witness fees in the amount awarded. Therefore, we find the assignments of error addressing these issues to be without merit.
DISPOSITION
For the foregoing reasons, we affirm the trial court’s decision in all respects. We tax the Natchitoches Parish Port Commission with all costs of this appeal.
[ ai AFFIRMED.